13214

TEMPLE v. ATLANTIC COAST LINE R. R. CO.

(163 S. E., 644)

*Messrs. T. W. Davis, Douglas McKay, H. E. Gyles* and *V. E. Phelps,* for appellant,

July 31, 1931.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This case, commenced in the Court of Common Pleas for Florence County, but transferred to Aiken County, is an action under the Federal Employers' Liability Act (45 U. S. C. A., §§ 51-59) for the alleged wrongful death of the plaintiff's intestate, Joseph R. Temple. The defendant, by way of answer, set up a general denial and wrongful and malicious act of a third party. The case was tried in the Court of Common Pleas for the said county of Aiken, before Honorable C. J. Ramage, special Judge (now regular Judge), and a jury, November 20, 1928, resulting in a verdict for the plaintiff for the sum of $20,000.00 actual damages. From the entry of judgment on the verdict the defendant has appealed to this Court.

A number of exceptions are presented, but the only allegation of error relied on by appellant for reversal is: "There is no evidence to show negligence by appellant in maintaining its tracks, as alleged, but on the contrary, the undisputed circumstantial evidence shows that the wreck was caused by the criminal acts of third persons."

We shall, therefore, not consider any of the other questions raised by the exceptions.

At the time of his death, June 20, 1921, the plaintiff's intestate, Joseph R. Temple, was in the employ of the defendant, Atlantic Coast Line Railroad Company, as a locomotive engineer, running on passenger train No. 38 from Augusta, Ga., bound for Sumter, S. C., engaged in interstate commerce. When the train had proceeded several miles from the city of Augusta and was near Beach Island, in Aiken County, S. C., the engine attached to said train overturned, together with two of the attached cars, and, as a result, the plaintiff's intestate was wounded, which caused his death. The suit was brought for the benefit of the infant children of the deceased who reside with their grandmother, their mother, widow of the deceased, having died while the action was pending. It appears that two of these children are feeble-minded. The acts of negligence, charged and relied on by the plaintiff as a basis of recovery, are as follows:

"4. That late in the afternoon of May 19th, 1921, the agents, servants and employees of the Charleston and Western Carolina Railway had been working on the roadbed over which said engine was driven at the point where the same was overturned and had negligently, carelessly, wilfully and wantonly failed to properly spike and bolt one of the iron rails on which said engine and train of cars had to run and keep the same properly spiked and bolted, and that when said engine and cars came upon said rail the same did not hold in the position it should have held to support the engine and cars, but one of the rails spread, thus causing the engine on which plaintiff's intestate was riding to turn over and the resultant death of plaintiff's intestate.

"5. That although the defendant Atlantic Coast Line Railroad Company was not in the actual charge of the maintenance of the said track at the place of the accident, yet it was its duty to see that its employees were furnished a safe track

on which to operate its trains, the negligence and careless-
ness of the servants, agents and employees of the Charleston
& Western Carolina Railway in the construction and main-
tenance of its roadbeds and tracks used by the defendant
Atlantic Coast Line Railroad Company being the negligence
and carelessness of the defendant Atlantic Coast Line Rail-
road Company."

Counsel for respondent state their position as follows:
"The allegation of the complaint being that the death of
plaintiff's intestate was due to the negligence and careless-
ness on the part of the defendant to properly spike and bolt
one of the iron rails on which said engine and train of cars
had to run and its failure to keep the same properly spiked
and bolted, the result being that when said engine and train
of cars came upon said rail the same did not hold in position
to support the engine and cars, if there was sufficient testi-
mony to support that allegation, the verdict should be sus-
tained."

As stated, the contention of appellant is: "There is no
evidence to show negligence by appellant in maintaining its
tracks, as alleged, but, on the contrary, the undisputed cir-
cumstantial evidence shows that the wreck was caused by
the criminal acts of third persons."

The federal statute (Federal Employers' Liability Act §
1 [45 U. S. C. A., § 51]) under which the action was in-
stituted reads as follows: "Every common carrier by railroad
while engaging in commerce between any of the several States
or Territories, or between any of the States and Territories,
or between the District of Columbia, and any of the States
or Territories, or between the District of Columbia or any
of the States or Territories and any foreign nation or
nations, shall be liable in damages to any person suffering
injury while he is employed by such carrier in such com-
merce, or, in the case of the death of such employee, to his
or her personal representative, for the benefit of the surviv-
ing widow or husband and children of such employee; and,

if none, then of such employee's parents; and if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

In accordance with the requirement of this statute, as construed by the Courts, the plaintiff assumed the burden of establishing negligence on the part of the defendant as to the acts alleged to have caused the death of the plaintiff's intestate, that is, the failure to properly spike and bolt one of the iron rails on which said engine and train of cars had to run, and keep the same properly spiked and bolted. In its answer the defendant admitted that one of its rails in the track at the point where the accident occurred did not hold, but the defendant contends, as alleged, that the failure of the said rail to hold was caused and occasioned by the malicious act or acts of a person or persons not in the employ of the defendant, without the knowledge and without opportunity of discovery on its part. As stated by the trial Judge in his refusal to order a new trial, the plaintiff relied on nine circumstances to establish the act or acts of negligence alleged, to wit: (1) The fact of section hands working in neighborhood of wreck; (2) the wreck itself; (3) bolts unsecured; (4) spikes pulled clear and drawn; (5) bolts and nuts neatly piled at the ends of the tires; (6) angle plates were properly removed; (7) passage of four or five trains over the point before the wreck occurred; (8) the dent in the end of the rail; (9) the rigid part of the engine had passed over the point before rail spread. Just what time the section hands were working at or near the place of the wreck may be said to be in dispute, but, if the testimony of the witness C. M. Randall is to be believed, it may be reasonably inferred that they were working there, fixing a rail in the afternoon of May 19, 1921,

not many hours before the wreck occurred, which was on the following morning about 3 a. m. The other facts stated, 2 to 9, inclusive, are not in dispute or are clearly established. It clearly appears from the testimony that when an inspection of the scene was made soon after the wreck it was discovered that the rail in question was badly bent and the spikes and bolts where the track was loose were seen lying on the cross-ties, three or four cross-ties had been taken loose, and, it appeared, according to the witness Dobson, that the "flanges or angle plates were on the Augusta end of the rail." There also appeared to be a dent about the center of the middle of the rail. With reference to the condition of this rail, the witness Dobson testified:

"Q. A train going towards Augusta would not hit the rail that way? A. No, sir; it would push it back in, it looks like.

"Q. But one coming from Augusta would hit it? A. Yes, sir."

If this be true, a train going over the rail in question in the direction of Augusta would not be wrecked, and this accounts for the fact that the trains that passed over the place going in the direction of Augusta during the same night passed over safely. According to our view of the testimony, the conditions found to exist at the place of the accident lead to the conclusion that the rail in question was left unbolted and unspiked by the section hands and not caused and occasioned by some outside person, as contended by the defendant. It is hard to conceive of a person bent on mischief taking time enough to arrange the bolts and spikes in the order in which they were found and to have done the other acts in the manner described by witnesses. On the other hand, it may be reasonably inferred from all of the facts and circumstances that the section hands left the work at that place unfinished the evening before the wreck occurred. According to our view, this was an issue for the jury.

It may be that not any one of the circumstances to which we have referred would be sufficient to establish the allegation of negligence charged by the plaintiff against the defendant, but, when all of these circumstances are considered together, in our opinion, a case for the jury was made.

The exceptions are therefore overruled, and the judgment affirmed.

Mr. Chief Justice Blease, and Mr. Justice Stabler concur.

Mr. Justice Cothran (dissenting) : This is an action for damages alleged to have resulted from the wrongful death of the plaintiff's intestate, Joseph R. Temple, who at the time of his death was employed by the defendant company as the locomotive engineer of a passenger train being operated between Augusta, Ga., and Sumter, S. C., on May 20, 1921. At a point about four miles south of Augusta and about 2,500 yards north of a station on the Charleston & Western Carolina Railway, called Beach Island, the train was derailed, the engine was overturned, and the engineer was killed. Under an arrangement between the Coast Line and the Charleston & Western Carolina Railway Company, the train was being operated upon the track of the latter, between Augusta and Robbins, in Barnwell County; thence it ran upon its own track to Sumter and beyond. The negligence alleged in the complaint, as the cause of the derailment, is that the employees of the Charleston & Western Carolina Railway Company had failed to spike and bolt one of the rails and keep the same spiked and bolted, causing the rail to spread and the engine to turn over.

The case was tried before his Honor, Judge Ramage, and a jury at Aiken in November, 1928; the trial resulted in a verdict for the plaintiff of $20,000.00 actual damages. Motions for nonsuit, direction of verdict and new trial were made by the defendant and overruled. From the judgment entered upon the verdict the defendant has appealed.

I propose to discuss only the motion of the defendant for a directed verdict in its favor upon the ground that there was

not sufficient evidence of negligence on the part of the defendant, or of those for whom it was responsible, to require or justify a submission of that issue to the jury.

It is conceded on all sides, in fact it is so alleged in the complaint, that the case is one under the Federal Employers' Liability Act. In the case of *Shiver v. R. Co.,* 155 S. C., 531, 152 S. E., 717, 720, this Court quotes with approval from the case of *Atlantic Coast Line R. Co. v. Davis,* 279 U. S., 34, 49 S. Ct., 210, 73 L. Ed., 601, as follows: "It is unquestioned that the case is controlled by the Federal Employers' Liability Act, under which it was prosecuted. Hence, if it appears from the record that under the applicable principles of law as interpreted by the Federal Courts, the evidence was not sufficient in kind or amount to warrant a finding that the negligence of the Railroad Company was the cause of the death, the judgment must be reversed."

The effect of this ruling is to annul, in cases arising under the Federal Employers' Liability Act, the rule applied by this Court, known as the scintilla rule, and to impose upon the State Courts, in such cases, the duty of examining the evidence and determining whether there was sufficient evidence of negligence to have justified the finding of the jury that such negligence was established; and, if not, the duty becomes imperative to direct a verdict in favor of the defendant.

In the latest case upon the subject, *Gunning v. Cooley,* 281 U. S., 90, 50 S. Ct., 231, 233, 74 L. Ed., 720, the Court said: "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' " Citing cases.

Again: "Where the evidence on any issue is all on one side, or so overwhelmingly on one side as to leave no room

to doubt what the fact is, the Court should give a peremptory instruction to the jury. [Citing cases.] 'When a plaintiff produces evidence that is consistent with a hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither.' [Citing cases.] The burden was on plaintiff to establish the negligence and injury alleged; and, if the evidence failed adequately to support either element, defendant's motion should have been granted.'

The plaintiff offered only two witnesses, a man named Dobson, who conducted business in a store at the Beach Island station and a gravel bed not far from the wreck, and a farmer named Randall, who lived near the station.

Dobson visited the scene of the wreck the next morning about 6:30; he testified that the indications were that the rail had been tampered with by some evil disposed person; that the rail was torn up; that the spikes holding the rail to the cross-ties had been pulled out and were lying loose on the cross-ties; that the bolts holding the angle bars in place at the joint of two rails had been unscrewed and removed, and were likewise lying upon the cross-ties; that, after the rail spikes had been drawn and the angle bars removed, one end of the rail had been bent over toward the center of the track and spiked down to the cross-ties, making a derailment inevitable; that there was a dent about the middle of the rail indicating that the rail had been pushed in towards the center of the tract; that later in the day he was at the wreck and remarked that "it looked like it had been wrecked, and there might be some tools"; that he followed tracks leading from the point of derailment to a gravel pit some 50 feet away. and there found among the bushes a crowbar used for pulling spikes and a wrench used for removing nuts from bolts; both tools were marked as the property of the Southern Railway Company whose line was some five or six miles away; that the spikes holding rails to the cross-ties had been removed, pulled out, not mashed out, from three cross-ties, and at the points from which they were drawn were indica-

tions of abrasions from the "heel" of the crowbar, evidently caused as the spikes were withdrawn.

The other witness for the plaintiff, one Randall, testified that on the afternoon before the wreck he had seen hands working on the railroad, apparently fixing a rail, at a point between Beach Island station and the gravel pit; that he was at the crossing at Beach Island station, looking toward Augusta; he could not say just where they were or what they were doing. The blueprint in evidence shows that it is exactly a mile from the crossing at the station to a curve in the track toward Augusta, and half a mile from the curve to the point of the wreck. It is impossible, therefore, for the witness Randall to have seen the point of the wreck from the crossing at Beach Island, even if it could be considered that there was anything in his testimony indicating that the track was disrupted by the section force that he saw at work.

It seems impossible to conclude that there was the slightest evidence from this testimony tending to show that the derailment was caused by an act of the Charleston & Western Carolina Railway Company; much less does it show that there was sufficient evidence upon the issue to justify submission to the jury. On the contrary, considering the evidence alone produced by the plaintiff, the conclusion is irresistible that the derailment was caused by an outsider.

The testimony of witnesses for the defendant exonerates the Charleston & Western Carolina Railway Company beyond the shadow of a doubt.

The section foreman testified that he had not worked on the track at the place of the wreck for sixty days; on going to the wreck the day after, he found that dents where spikes were removed which held the rails to the cross-ties were freshly made by the "heel" of the crowbar.

The roadmaster upon going to the wreck with other officials that morning found that a rail had been taken out and the spikes pulled out of the ties and not mashed; that the bolts had been taken from the angle bars and the rail shoved out of position; that there were dents in the ties

where the spikes had been pulled by the crowbar; that the rail fastenings were lying on the ground or upon the cross-ties with the spikes scattered along.

Davies, a planter, who lived at Beach Island and saw the wreck that morning, testified that one end of the rail going from Augusta was set in, and the angle bars had been removed; that the bolts and nuts were on the track near this end of the rail and the spikes had been drawn so as to set the rail in; that the rail had been unbolted and set in and was spiked down to the cross-ties; that a car wheel had hit the end of the other rail toward Augusta; that the rail had been pulled in out of line from one to three inches and spiked down; that the angle bars connecting this and the other rail had been entirely removed.

The general roadmaster of the defendant company, who arrived at the wreck about 9:30 a. m., found that the rail had been removed, the bolts and angle bars taken off and were lying on the ground; that the spikes had been pulled clean and clear from the cross-ties with a crowbar, and the rail pushed out of its original position; that the outside spikes of the removed rail were lying between the ties.

The engineer of maintenance of way of the Charleston & Western Carolina Railway Company, who arrived at the wreck about 5:30 a. m., found conditions with respect to the rail being removed and the bolts and spikes drawn, as testified to by the other witnesses; that the bolts and nuts were in a pile at the end of the rail and the spikes were lying between the ties near the original position of the rail; that section foremen in pulling spikes pull clear and do not bend them, and are instructed to gather them up and take them to the section house.

The wrecking foreman, who arrived about 5:30 a. m., found one rail was ripped up with the spikes drawn, leaving a clean hole, not mashed out, and the rail shoved out of line; that when spikes are mashed out by a wreck the spikes will be crooked and the holes larger; that about eight spikes had been pulled from the inside of the rail; that you could

see the "heel" print from the crowbar where they had been drawn; that a section master will break the bolts with a hammer in removing angle bars, and carry away the scrap; that the angle bars were pulled and were lying near the joint.

The conductor of the wrecked train found a rail disconnected, the angle bars off with the bolts out and the nuts first screwed off; that the spikes, nuts, bolts, and angle bars were lying on the ground.

The flagman found about the same condition as to bolts and angle bars.

The vice-president and general manager of the Charleston & Western Carolina Railway Company arrived between 6:00 and 8:00 o'clock a. m., and found that the rail had been removed with the angle bars loose on either side of it, the spikes on one side of the rail removed and the rail pushed forward; that all the bolts and spikes were taken out of the rail.

A passenger on the wrecked train, who was also an inspector and special investigator for the Interstate Commerce Commission with large experience, examined the track immediately after the wreck and testified that one rail was out of place and that the angle bars had been removed; that the angle bars, bolts, and nuts which were lying close by indicated that they had been removed by some one intentionally; the condition of the bolts showed that they had not been stripped in any way, and that the track was in nearly perfect condition as to line and gauge; that the spikes from the ties had been pulled directly upward; that there would have been a slanting pull or a splintered tie if they had been crushed out.

The evidence further showed that the track at the place of the wreck had been newly timbered, bolted up, and serviced about two months or less before the wreck and was practically built over; new cross-ties put in and the track had had time to settle.

Seven engineers who operated trains over the place of the wreck, some of which passed the point the afternoon and evening before the wreck, and up to about 1:35 a. m., about

an hour and a half before the wreck, testified that they noticed nothing unusual in passing over this point and no defect in the track; that the ties were new, the track in good condition, and the rails and appliances were of proper strength.

The roadmaster had inspected the track as late as 5:30 p. m., on the day before the wreck.

The engineer of maintenance of way had been over the track on Tuesday prior to Friday, the day of the wreck.

Seven trains, both freight and passenger, passed over the place of the wreck in both directions between the afternoon and the time of the wreck.

The section foreman of the Southern Railway Company, whose section house was about four miles from the place of the wreck, testified that his section toolhouse had been entered at some time during the afternoon or night preceding the wreck and a crowbar and a wrench taken therefrom; he identified the tools found near the wreck as those stolen from his toolhouse.

The evidence tending to sustain the allegation that the derailment was caused by the negligence of the section force of the Charleston & Western Carolina Railway Company is of the weakest possible character. Reliance is placed upon the testimony of the witness Randall who stated that he saw a section force working on the track as if they were adjusting a rail, at some time in the afternoon. He was unable to definately locate them or to tell what they were doing. This is absolutely the only evidence tending in the remotest degree to connect the Charleston & Western Carolina Railway Company with the derailment.

Against any inference that the section force was connected with the derailment is the conceded fact that Randall could not have seen the force working near the place of the wreck; he must have seen them within the mile between the road crossing and the curve in the track. Against it also is the fact that seven trains passed over the track between evening

and the wreck, one of which passed after 1 o'clock a. m., long after, it must be assumed, the section force "knocked off," an impossibility if the force had left the track in the condition which caused the derailment. Against it also is the extreme improbability that the section foreman, or any of the force, would in broad daylight commit such an act.

It appears to me that the case is controlled by the doctrine declared in *Patton v. R. Co.,* 179 U. S., 658, 21 S. Ct., 275, 277, 45 L. Ed., 361 : "The fact of accident carries with it no presumption of negligence on the part of the employer; and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. *Texas & P. R. Co. v. Barrett,* 166 U. S., 617, 41 L. Ed., 1136, 17 S. Ct., 707. Second, That in the latter case it is not sufficient for the employee to show that the employer may have been guilty of negligence; the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony; and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." See, also, *Atlantic Coast Line R. Co. v. Driggers,* 279 U. S., 787, 49 S. Ct., 490, 73 L. Ed., 957; *Atlantic Coast Line R. Co. v. Tyner,* 278 U. S., 565, 49 S. Ct., 35, 73 L. Ed., 508; *Atlantic Coast Line R. Co. v. Powe,* 282 U. S., 836, 51 S. Ct., 212, 75 L. Ed., 743; *Norfolk & W. R. Co. v. Gillespie* (C. C. A.), 224 F., 316; *Savitz v. R. Co.,* 199 Pa., 218, 48 A., 987.

For these reasons I think that the judgment of the Circuit Court should be reversed, and the case remanded to that Court for the entry of judgment in favor of the defendant under Rule 27.