GUY W. WILLIAMS, Appellant, v. ST. LOUIS-SAN FRANCISCO RAILROAD COMPANY, a Corporation.—85 S. W. (2d) 624.

Division One, July 30, 1935.

*Bartley & Mayfield* for appellant.

*J. W. Jamison, A. P. Stewart* and *C. H. Skinker, Jr.,* for respond-ent.

670

PER CURIAM:—Action under the Federal Employers' Liability Act for personal injury received in a wreck. The cause was tried to a jury resulting in a verdict for plaintiff for $15,000. Motion for new trial was sustained and plaintiff appealed.

The petition is bottomed upon the *res ipsa loquitur* doctrine and alleges that plaintiff had no knowledge or means of knowledge of the cause or causes that operated to bring about the wreck; that the derailment and wrecking of the train and plaintiff's injuries were directly caused by the negligence of the defendant. The answer is a general denial.

The motion for new trial was sustained on the ground that the court erred in refusing defendant's peremptory request for a directed verdict. The contention is that under the law and the facts the *res ipsa* rule cannot be invoked. It was conceded that both plaintiff and defendant, at the time of the wreck and plaintiff's injuries, were engaged in interstate commerce.

Plaintiff for several years had been employed by defendant as train auditor and his sole duties were to collect tickets and fares. He boarded defendant's passenger train, the Texas Special, at Union Station, St. Louis, about six-ten P. M., Sunday, August 31, 1930. The train consisted of twelve coaches, six of which were Pullmans, which were in the rear. About fifteen miles out at what is called Osage Hills, while passing around a curve at a speed between forty and fifty miles per hour, a disastrous wreck occurred resulting in serious injury to plaintiff, and the amount of the verdict is not challenged in defendant's brief. The engine and five or six forward coaches left the track. Plaintiff had no control over the management of the train and knew nothing about the condition of the equipment, the track, roadbed, etc. His duties were confined solely to the fares.

At the place where the wreck occurred, defendant maintained two tracks designated as the outbound and the inbound. The train was going west on the north or outbound track. The evidence for plaintiff was to the effect that there were wheel marks on the ties north of the north rail of the outbound track and also north of the south rail of the same track; that these marks extended some 200 feet west,

from the point of beginning to a switch on the north side of the outbound track; that about two feet east of the point where these marks on the ties first appeared, the north rails on the outbound track and on the outside of the curve were joined with angle bars which had four holes for bolts; that two of these holes were without bolts, and the nut on each of the two bolts in the bars was sheared off; that there was a spike about eighteen inches west of the angle bars mentioned and this spike was bent over from the rail; and plaintiff's evidence tended to show that about seventy-five per cent of the ties from the switch east to the point where the wheel marks first appeared on the ties "were in a more or less deteriorated condition." The condition of the ties east of the point where the wheel marks first appeared on the ties is not clear. Plaintiff's evidence also tended to show that the train at the time of the wreck was about four minutes behind schedule.

Plaintiff testified that after leaving the station, he had worked the train and had gone "to what we call the office or combination . . . that is, the office where we unload our stuff, and had just got my stuff out of my pockets like this and had not yet gotten it all out, I don't think, when I felt some sudden jar and leaving the track and a kind of lurch that way, and a lot of dust, and that quick, I went out." Plaintiff was rendered unconscious and was in the hospital some time thereafter.

George D. Schroeder, chief of police of the city of Kirkwood, and a witness for plaintiff, testified that he arrived at the scene of the wreck about seven o'clock and shortly after the wreck and that about eight o'clock, he made an examination of the track from the switch east for "about 200 or 220 feet," and that he saw the wheel marks on the ties; and that "at the point where I first saw the marks on the ties like wheels had been over them, I didn't see or notice any rocks or anything of that kind around there. There was none right there, only little bit of rocks such as gravel and things like that, ballast rocks on the tracks." This witness stated that he examined particularly as to rocks, and as we interpret the record, the reference to the point where he first saw the marks on the ties is the point east of the switch where the marks first appeared on the ties. We mention the subject of rocks here because, as will presently appear, it was the theory of defendant that some one not connected with it, put a rock or rocks on the north rail of the outbound track and that such caused the wreck. Schroeder further testified as to the angle bars with only two bolts and the nuts of these sheared off as above stated. He stated on cross-examination that the rails joined by the angle bars mentioned were "still together and held by the tie plate and two bolts."

Archie W. Kehr, a witness for plaintiff, testified that two or three days after the wreck, he examined the track for a distance of 200

or 300 feet east from the switch and that the ties he observed "were rotted." This witness examined from the switch east to the "hot dog stand," but it is not disclosed how far east of the switch this stand was. He stated that the ties along by the hot dog stand "were not pulled out of the ground at that point. They were still in the ground. They were not pulled up, but you could take pieces out of them, or kick pieces off of the top of the ties with your foot.'"

Corliss N. Williams, a contractor and builder and a son of plaintiff, went to the scene of the wreck in the forenoon of the next day thereafter to get his father's clothing and while there, made an examination of the track from a point a short distance west of the switch back east as far as the wheel marks appeared on the ties. This witness testified that he noticed "some marks on the ties there at a point east of where the engine lay. With reference to the place where these marks occurred on the ties, at that point or back immediately east of there, I would say the general condition of the entire roadbed was about 75% of the ties were bad; 75% of the ties were in a more or less deteriorated condition. I mean the ties were in a decaying stage of preservation. I didn't notice anything at all with reference to the rails or marks on the steel rails themselves. I do not know anything about the angle bars or anything like that." On cross-examination, this witness testified: "Q. Were there any rails out or any track torn up east of the switch stand that you observed? A. Yes. They were not torn up but they were loose. They had been pulled loose. Q. Out of position? A. Yes, sir. Q. East of the switch stand? A. Yes. The rails were in a more or less spread condition from the train."

Defendant's evidence tended to show that beginning at a point about twenty-five feet east of the point where the wheel marks first appeared on the ties, there was a mark called a flange mark on the ball or top of the north rail of the outbound track; and that at the point where this flange mark first appeared on top of the north rail, there was crushed and powdered limestone rock on top of the rail, which powdered rock was described by defendant's special agent as "about one-sixty-fourth of an inch thick to the extent of half an inch or three-quarters, and ten inches long." It also appeared from the evidence of the defendant that the angle bars above mentioned were at or very near the point where the flange mark left the top of the rail, and where the marks commenced on the ties north of the north rail and north of the south rail of the outbound track. Defendant's evidence also tended to show that the nuts on the bolts mentioned were sheared off when the pony trucks under the engine went off from the top of the north rail of the outbound track onto the ties. D. J. Chenault, special officer of the defendant at the time of the wreck, testified that "where the wheel of the pony trucks left the

rail, it struck two nuts where the ties (rails) were joined together with an angle iron and sheared those off on the north side."

B. F. Laretto, signal maintainer for the defendant testified that he was at the scene of the wreck shortly thereafter and made an examination and found "some powdered rock on the north rail and some rock near the rail. The rock was on the north side of the rail and between the two rails in the middle of the track, and pulverized stone was on the flange of the rail on the inside and outside of the north rail. Kind of limestone, white." This witness testified that the track ballast was round river gravel and that it did not look anything like limestone rock; that there was a footpath that crossed the tracks and that this rock was about three feet west of the footpath. He also testified that he "found a little crease along the center of the rail (north rail of the outbound track) where the flange of the wheel came on top of the rail, the ball of it. The flange mark (on top of the rail) started right about a foot or so west from where I found the rock."

A. P. Rock, special agent of the defendant, went to the scene of the wreck shortly thereafter and testified that he made an investigation of the track conditions and that the switch was properly lined up and intact; that he went back over the track east from the switch and discovered wheel marks on the ties for a distance of 211 feet east from the switch; that east from the point where the wheel marks first appeared on the ties east of the switch, this witness testified that he found "a mark on the ball of the rail which was for 27½ feet. I mean the top of the rail. When I say mark, I mean just indentation or marks caused by something like a wheel." He also testified that just a short distance west of the point where the flange marks first appeared on top of the rail, there were two rocks "two to three inches in thickness, 5½ inches long; one about 4 inches wide and the other a little bit smaller." It appeared from the investigation made by the defendant that some boys, a short time before the wreck, came from the stone quarry south of the tracks and passed over the tracks. The quarry mentioned was an abandoned quarry and had not been used for many years except for picnics, etc. The evidence of the defendant tended also to show that the ties were not rotten, but were in good condition and that a passenger train such as the Texas Special could be operated around the curve mentioned in the evidence at seventy-five or eighty miles per hour with reasonable safety. It was the theory of the defendant that a rock had been placed on the north rail of the outbound track and that when the pony trucks struck this rock that the flange of the right front wheel of the trucks went upon the rail and there traveled twenty-five to twenty-seven feet and then went off on the ties to the north and so continued to the switch, a distance of some 200 feet. The engine and forward cars involved in the wreck, piled up, so to speak, im-

674

mediately west of the switch, and the fireman and engineer were killed.

J. A. Moran, defendant's superintendent, testified that the card rate of the Texas Special between Union Station and over the point where the wreck occurred was 39.3 miles per hour; that the maximum speed allowed for passenger trains on curves was fifty-five miles per hour; that the train in question could operate around the curve where the wreck occurred at seventy-five or eighty miles per hour with reasonable safety. This witness was basing his evidence on the assumption that the track was in good condition, as he testified that it was. On cross-examination, he was asked to tell the jury whether it would make any difference if fifty to seventy-five per cent of the ties were defective and decayed as to the speed of the train and answered, "it certainly would."

D. E. Gellwix, defendant's division engineer, testified that he arrived at the scene of the wreck about four o'clock on the morning thereafter; and inspected the track east from the switch and found it in good condition; that the ties were better than the average conditions; that if there were three or four rotten ties together there might be a derailment; that rotten ties will cause the wheels to fall in between the rails; that the pressure of the wheels on the rails causes a spread when the ties are rotten; and that if the front wheels of an engine came up on top of the rail on a curve and rode on top of the rail until it came off, that such would not indicate a bad tie condition; that a bad tie condition causing a derailment, the wheels would drop between the rails by reason of the pressure on the rails over the rotten ties; that the wheels climbing on top of the rail would indicate a rigid condition of the ties and anything but a bad condition of the ties. This witness further testified that the defendant did not have any trackwalkers along the point where the wreck occurred at the time it occurred, but stated that the track had been inspected the day of the derailment "by the roadmaster coverning that territory. . . . I think he was over it on a motor car on that day. I do not know how fast he went over it and can't say what style of inspection he made."

J. A. Rutledge, the roadmaster, testified that about seventy-five per cent of the ties at the place in question were creosoted; that he went over the track about eleven o'clock on the day of the wreck on a motor car; that he went over the westbound track; that he did not observe anything at all wrong with the track.

W. J. Ficke, general foreman of defendant's Lindenwood shops testified respecting an experiment made with a similar engine to the one involved in the wreck. The experiment was not made on the track at the place of the wreck. A limestone rock approximately one and one-half inches thick, two and one-half or three inches wide, and five inches long, was placed on the rail and the engine running at

two miles per hour was run upon the rock, and the front wheels were stopped on the rock and "then allowed the engine to come ahead sufficiently to measure the pile of the pulverized stone, which measured three-fourths of an inch." Then the second engine wheels went over the rock and after that, the pulverized stone was three-eighths of an inch. Then the entire engine was passed over the rock and "the pile had been reduced to one-sixteenth of an inch, spreading over some twenty inches on the ball of the rail." Witness further testified that two limestone rocks were placed on the rail about the same size, and the engine passed over them at ten miles an hour. "The first stone flew out, and the second stone was run up and as it ran up, it bounced the lead engine wheel up sufficiently to see daylight between the rail and the outer flange of the rail. It seemed you could see five-eighths inch daylight, and we let the rest of the engine pass over it, and there was a streak of dust on the ball of the rail."

Plaintiff's main instruction, after predicating his employment, time and place of the wreck, directed that if the jury found that "while said train was being so operated by defendant, if shown, said train suddenly left the rails of the defendant and was wrecked and plaintiff was thereby directly caused to be injured; and if you further find and believe from the evidence that the derailment and wreck of said train and the engine attached thereto was directly due to and directly caused by negligence on the part of the defendant, and the plaintiff was injured as the direct result of such negligence, if shown, then your verdict will be for the plaintiff."

The trial court when motion for new trial was sustained, filed a memorandum opinion which discloses that the motion was sustained on the theory that under the Federal Employers' Liability Act, the *res ipsa* rule cannot be invoked. Under the Federal Employers' Liability Act, the rules of pleading and practice of the State courts are applicable. Lopez v. Hines (Mo.), 254 S. W. 37, but the substantive law is to be determined by applicable Federal decisions. [Moran v. Railroad, 330 Mo. 278, 48 S. W. (2d) 881.]

In the brief, to support the contention that plaintiff cannot under the facts, invoke the *res ipsa* rule, defendant cites and relies upon Patton v. Texas & Pacific Railroad Co., 179 U. S. 658, 45 L. Ed. 361, 21 Sup. Ct. 275; Seaboard Airline Railroad Co. v. Horton, 233 U. S. 492, 58 L. Ed. 1062, 21 Sup. Ct. 275; New Orleans & Northeastern Railroad Co. v. Harris, 247 U. S. 367, 62 L. Ed. 1167, 38 Sup. Ct. 535; Looney v. Metropolitan Railroad Co., 200 U. S. 480, 50 L. Ed. 564, 26 Sup. Ct. 303; Delaware, Lackawanna & Western Railroad Co. v. Koske, 279 U. S. 7, 73 L. Ed. 578, 49 Sup. Ct. 202; New York Central Railroad Co. v. Ambrose, 280 U. S. 486, 74 L. Ed. 562, 50 Sup. Ct. 198; Mo. Pac. Railroad Co. v. Aeby, 275 U. S. 426, 72 L. Ed. 351, 48 Sup. Ct. 177; Atlantic Coast Line Rail-

road Co. v. Temple, 285 U. S. 143, 76 L. Ed. 670, 52 Sup. Ct. 334; Payne v. Bucher, 270 Fed. 38.

In the Patton case, plaintiff was a fireman. In getting down from the engine, the step turned and he fell, his foot going under the engine and was so crushed that amputation was necessary. He alleged that the step turned because the nut which held it was not securely fastened; that the omission to have the nut fastened was negligence. A verdict was directed for the defendant, which was affirmed. In the course of the opinion, after stating the facts, the court said: "Upon these facts we make these observations: First. That while in the case of a passenger the fact of an accident carries with it a presumption of negligence on the part of the carrier, a presumption which in the absence of some explanation or proof to the contrary is sufficient to sustain a verdict against him, for there is prima facie a breach of his contract to carry safely (Stokes v. Saltonstall, 13 Pet. 181; Railroad Company v. Pollard, 22 Wall. 341; Gleeson v. Virginia Midland Railroad, 140 U. S. 435, 443), a different rule obtains as to an employee. The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. [Texas & Pacific Railway v. Barrett, 166 U. S. 617.] Second. That in the latter case it is not sufficient for the employee to show that the employer may have been guilty of negligence—the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony, and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

The facts as reported in the Patton case disclosed that plaintiff was injured in the yards; that he got on the engine to accommodate his own convenience after it had made a run and before he was required to get on it, and when he knew it had not been inspected after the run. The engine had been supplied with coal after the run and before plaintiff got on it. The court stated that it appeared from the facts that the defendant furnished suitable appliances in good condition; that they were properly secured when the engine started on its trip and that it was impossible to tell how the step was loosened; that it might have been from the ordinary working of the engine or because the step struck something on the trip, or from dropping

on the step some of the large pieces of coal which were thrown into the tender. The decision in the Patton case was in 1901 and prior to the enactment of the Federal Employers' Liability Act in 1908. and the subject of *res ipsa* doctrine was not as such discussed, but reference was made to it.

The Horton case, supra, was under the act. Plaintiff was an engineer. There was a thin glass water gauge to show the water level in the boiler. The thin glass gauge was guarded by a heavy glass container called the guard glass. As an alternative but less convenient, gauge cocks were provided for determining the water level. Plaintiff testified that on a trip he observed that the guard glass was missing and upon his return the following day, he reported this to the roundhouse foreman and asked for a guard glass; that the foreman stated that there were none in stock and that it would be necessary to send for one; that he would do this and the plaintiff meanwhile could run the engine without a guard glass. The unguarded thin glass water gauge exploded and plaintiff was injured. The defendant's evidence tended to show that when the engine was placed in plaintiff's charge, the gauge was in good condition with the guard glass in place; that the gauge cocks were in good condition; that it was the duty of the engineer to inspect his engine and if not in good condition, to make a written report to the roundhouse foreman, specifying defects; that if anything should happen to the water glass, it was his duty to close the valves so as to exclude pressure from it and use the gauge cocks; that plaintiff made repeated reports between the time he took the engine out and the time of his injury, in which reports, he mentioned things needed but made no mention of the water glass or guard glass. The fireman testified that when plaintiff first took the engine out, the water glass was guarded, but that the guard was smoky and that he, the fireman, in the presence of plaintiff, removed the guard glass to clean it and that in doing this it was broken.

The case was tried in the Superior Court of North Carolina where plaintiff had judgment and this judgment was affirmed by the Supreme Court of North Carolina. The Supreme Court of the United States reversed the judgment and remanded the cause because of error in the instructions, which among other errors mentioned, made the defendant's duty absolute to furnish a safe place and appliances. The *res ipsa* doctrine was not discussed, but in the opinion it is stated: "To hold that under the statute the railroad company is liable for the injury or death of an employee resulting from any defect or insufficiency in its cars, engines, appliances, etc., however caused, is to take from the act the words 'due to its negligence.' The plain effect of these words is to condition the liability upon negligence."

The Harris case, supra, was under the act. Harris was a brake-

man and was run over and killed by an engine in the yards at New Orleans. His mother as administratrix brought suit in the State court of Mississippi where she had judgment which was affirmed by the Supreme Court of Mississippi. Under a statute of Mississippi, the court instructed that all that was required of plaintiff was "to prove that injury was inflicted by the movement of defendant's train or engine and then the law presumes negligence and then the burden of proof shifts to the defendant to prove all of the facts and circumstances surrounding the injury and from those facts so shown, exonerate itself from all negligence." The judgment was reversed and the cause remanded, and in the course of the opinion, the Supreme Court stated that Federal courts have long held that where suit is brought against a railroad for injuries to an employee resulting from its negligence, such negligence is an affirmative fact which plaintiff must establish. The res ipsa rule is not discussed.

The Looney case, supra, reached the Supreme Court by writ of error to the Court of Appeals of the District of Columbia. It was contended that Looney was killed by an electric shock while transferring an appliance called a plow from the Metropolitan line to the Great Falls line and it was alleged that the conductor was negligent in permitting the trolley pole to come in contact with the trolley wire. It did not appear from the evidence that Looney was killed while removing the plow, but that he received the shock while adjusting the leads. And it appeared from the evidence that the trolley pole was not in contact with the trolley wire when the plow was removed. In the Looney case, judgment went for defendant in the trial court which was affirmed by the Court of Appeals. The Supreme Cour affirmed the judgment for the defendant, and in the course of the opinion, said: "To hold a master responsible, a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of injury. There must be some substantive proof of the negligence. Knowledge of the defect or some omission of duty in regard to it must be shown." The Looney case was prior to the enactment of the Federal Employers' Liability Act and the subject of res ipsa rule is not discussed.

The Koske case, supra, was under the Federal Employers' Liability Act. Plaintiff was employed in the roundhouse and coal chute yard. The complaint alleged that the defendant negligently permitted an open, uncovered, unlighted and dangerous hole to exist between certain parts of the tracks, and that plaintiff, at four o'clock in the morning, while alighting from an engine in the course of his employment, fell into the hole and was injured. The suit was filed in the State court of New Jersey. At the close of the evidence defendant moved for a directed verdict on the ground that the evidence was not sufficient to warrant a finding of negligence and that it conclusively appeared that plaintiff assumed the risk. A directed verdict was re-

fused and verdict and judgment went for plaintiff, which judgment was affirmed by the highest court of the State of New Jersey and the cause was taken to the Supreme Court by certiorari and the judgment reversed. It was held that the evidence was not sufficient to warrant a finding that defendant was guilty of any breach of duty owed to plaintiff respecting the condition of the drain, and also held that because of plaintiff's knowledge of the situation and condition that he "must be held to have fully understood and appreciated the risk." In the course of the opinion the court said: "The Federal Employers' Liability Act permits recovery upon the basis of negligence only. The carrier is not liable to its employees because of any defect or insufficiency in plant or equipment that is not attributable to negligence. The burden was on plaintiff to adduce reasonable evidence to show a breach of duty owed by defendant to him in respect of the place where he was injured and that in whole or in part his injuries resulted proximately therefrom. And, except as provided in Section 4 of the act, the employee assumes the ordinary risks of his employment; and, when obvious or fully known and appreciated, he assumes the extraordinary risks and those due to negligence of his employer and fellow employees. [Seaboard Air Line v. Horton, 233 U. S. 492, 501; St. Louis, etc., Ry. v. Mills, 271 U. S. 344; Northern Ry. Co. v. Page, 274 U. S. 65, 75.] The record contains no description of the place where plaintiff was injured other than that above referred to. Fault or negligence may not be found from the mere existence of the drain and the happening of the accident." The res ipsa rule as such was not discussed in the Koske case.

The Ambrose case, supra, was under the act. The railroad company owned and operated a grain elevator and Ambrose, who worked at the elevator for the railroad company, fell into one of the bins containing poisonous gas and was dead when found. It was alleged that the railroad company was negligent in failing to furnish a safe place to work. Ambrose's duties were to sweep the floor, help set the grain spouts and generally do such work as his foreman directed. He had been warned that the bin was dangerous and to keep away from it as much as possible. As to how he got into the bin was not shown. Judgment went against the railroad company in the State courts of New Jersey and reached the Supreme Court on certiorari and the judgment was there reversed. In reversing the judgment, the Supreme Court quoted from Patton v. Texas & Pacific Railroad Co., 179 U. S. 658, supra, beginning with "the fact of accident carries with it," etc., as we have quoted supra, from the Patton case. The res. ipsa rule was not discussed as such in the Ambrose case. The court merely found that there was no negligence shown on the part of the railroad company.

The Aeby case was under the Federal Employers' Liability Act

and was filed in the Circuit Court of the City of St. Louis, Missouri, where plaintiff had judgment, which judgment was affirmed by the Supreme Court of Missouri. [Aeby v. Mo. Pac. Railroad Co., 313 Mo. 492, 285 S. W. 965.] The cause was taken to the Supreme Court of the United States by certiorari and judgment was reversed. Plaintiff, Mary I. Aeby, was station agent at Magnus, Arkansas, and fell on the station platform and was injured. She alleged that her injury resulted by reason of a defect or insufficiency in the platform due to the negligence of the railroad company. It was contended among other things that the evidence was not sufficient to sustain a finding that the railroad company was guilty of actionable negligence and that plaintiff assumed the risk and that her own negligence was the sole cause of her injuries. The Supreme Court of the United States held that the evidence was not sufficient to support a finding that the railroad company had failed in any duty that it owed plaintiff, and reversed the judgment on that ground. The *res ipsa* rule was not discussed in the opinion, but it was remarked in the course thereof ''fault or negligence on the part of petitioner may not be inferred from the mere fact that respondent fell and was hurt.''

The Temple case, supra, was under the Federal Employers' Liability Act. Temple was an engineer running between Augusta, Georgia, and Sumter, South Carolina. The train was derailed, the engine overturned and Temple was killed. Suit was filed by his administratrix in the State Court of South Carolina and the negligence alleged was the failure to properly spike and bolt one of the rails and to keep the same properly spiked and bolted. [See Temple v. Atlantic Coast Line Railroad Co. (S. C.), 163 S. E. 644.] Plaintiff had judgment and this judgment was affirmed by the Supreme Court of South Carolina. The cause reached the Supreme Court of the United States by certiorari where the judgment of the State court was reversed. At the time of the wreck, the train on which Temple was engineer was not on the road of the Atlantic Coast Line by whom Temple was employed, but was on the Charleston & Western Carolina Railway over which the Atlantic Coast Line had trackage rights. Summarizing the evidence of plaintiff's principal witness, the Supreme Court stated: ''He testified that the rail was 'torn up,' that spikes and bolts were 'laying on the cross-ties,' that three or four ties were 'taken loose,' that there was no doubt the spikes had been 'pulled,' that 'it was not a matter of fixing the track and leaving them out,' that the bolts and angle bars 'had been removed certain,' that there was a dent about the middle of the rail indicating that the rail 'had been pushed in,' and that one end of the rail had been 'pulled in' and 'spiked in from the outside' making the track 'too narrow' so that a train coming from Augusta would be derailed. Thinking that 'it looked like it had been wrecked and

there might be some tools,' the witness made a search, and following tracks leading to a gravel pit about fifty or sixty feet away, he found behind some bushes a crowbar used for pulling spikes and a wrench for loosening bolts; that these tools had identification marks showing that they belonged to the Southern Railway Company whose line was five or six miles distant.'' The evidence for the defendant railroad company gave a more extended description of the conditions from all of which the court came to the conclusion that the defective condition of the track which caused the wreck was the act of some one not connected with the railroad company and that the railroad company was not negligent. We revert to the Temple case, infra, in ruling the question as to the application of the *res ipsa* doctrine in the case at bar.

Payne v. Bucher, 270 Fed. 38, was under the Federal Employers' Liability Act. Bucher was an experienced employee of the director general of railroads and was boss of a gang whose duty was moving freight from place to place in the terminal yards of the Delaware, Lackawanna & Western Railroad Co. at Hoboken, New Jersey. He was furnished a tackle and steam crane. Iron buckets weighing two and one-half tons each were used and one of these buckets fell on Bucher and killed him. The suit was brought by the administratrix in the District Court of the United States for the District of New Jersey. The case went to the jury on the issue of negligence as to whether the defendant through his servant who attached the hooks to the bucket so carelessly adjusted them that they slipped off. The Circuit Court of Appeals held that there was no evidence that this employee carelessly fixed the hooks on the bucket except as it was inferred from the fact that they slipped off and on this subject, the court said that ''the fact of accident carries with it neither proof nor presumption of negligence on the part of the employer. Negligence of the employer is an affirmative fact to be established by the one speaking for the deceased employee.'' Supporting the statement of the law, Texas & Pac. Railroad Co. v. Barrett, 166 U. S. 167, 41 L. Ed. 1136, 17 Sup. Ct. 707, and the Patton case, supra, are cited. The court stated in the opinion that the facts of the case was not sufficient to invoke the *res ipsa* doctrine.

In the above-mentioned cases and others we have reviewed, the courts have generally held and properly so, that the mere fact of accident carries with it no presumption of negligence. There is nothing in any of the cases that defendant, in the case at bar, cites, that holds that the *res ipsa* rule may not be invoked in an action under the Federal Employers' Liability Act. So far as we are able to ascertain, it is held generally that the mere fact of an accident raises no presumption of negligence.

Central Railroad Co. of New Jersey v. Peluso, 286 Fed. 661, was under the Federal Employers' Liability Act and was tried and sub-

mitted under the *res ipsa* doctrine. Peluso, an employee, was engaged in unloading iron ore with a hoisting crane from a barge and placing it in cars. The crane overturned backwards into the water and Peluso was drowned. At the close of the case, motion was made for a directed verdict which was refused and judgment went for the administratrix, which was affirmed by the Circuit Court of Appeals and certiorari to the Supreme Court of the United States was denied. [261 U. S. 613, 67 L. Ed. 827, 43 Sup. Ct. 359.]

The Peluso case quotes from the Patton case, supra, as follows: ''The fact of accident carries with it no presumption of negligence on the part of an employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence.'' It is stated in the Peluso case that the excerpt quoted from the Patton case was not in any sense a declaration that the maxim or rule of *res ipsa*, when correctly understood, was not applicable to cases between master and servant.

Lowery v. Hocking Valley Railroad Co., 60 Fed. (2d) 78, was under the Federal Employers' Liability Act. Plaintiff, a freight train conductor, was riding in the caboose when a derailment occurred and he was injured. After the accident, it was found that a piece of heavy oak plank had been ripped from a crossing about a mile north of the place of derailment and this plank was found at the scene of the accident, bearing upon it marks which led to the conclusion that in some unexplained manner, this plank had been picked up by the train and carried a mile and there caused the derailment. It was held that the *res ipsa* rule was applicable.

In Cochran v. Pittsburg & Lake Erie Railroad Co., 31 Fed. (2d) 769, a number of Federal decisions are analyzed with reference to the *res ipsa* doctrine and the Federal Employers' Liability Act and there, the district judge said: ''Briefly stated, I do not doubt that this doctrine is now and always was applicable in many personal injury cases as between master and servant. This I believe to be particularly true when the master and servant were, at the time the injury was sustained, engaged in interstate commerce, and the case is controlled by the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59) or the several Federal Safety Appliance Acts. Whether it does in fact apply will depend upon the facts and circumstances characterizing the accident, rather than upon the relation between the parties, or whether it is controlled by the Federal Employers' Liability Act. This is true, even as between a carrier for hire and an injured passenger.''

Manning v. Chicago Great Western Railroad Co. (Minn.), 160 N. W. 787, 788, was an action by a locomotive fireman to recover damages for injuries caused by reason of the derailment of the engine and was under the Federal Employers' Liability Act. Plaintiff recovered in the trial court and the judgment was affirmed by the

Supreme Court of Minnesota. Plaintiff's evidence showed that the train was running thirty-five miles an hour around a sharp curve and that after the derailment the track was all torn up. There was no evidence to the contrary. The court, in discussing the *res ipsa* doctrine said: "Under our own decisions the rule has obtained for many years that as between employer and employee, the mere fact that an accident happens has no tendency to prove negligence, but that an accident may be of such a nature as to raise a presumption of negligence, and where the thing causing the accident is in the possession and under the control of the defendant, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care and the plaintiff can in no sense be said to have contributed to it, then the fact that the accident happened affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of due care." Certiorari was denied by the United States Supreme Court in the Manning case. [See Chicago Great Western Railroad Co. v. Manning, 243 U. S. 643, 61 L. Ed. 943, 37 Sup. Ct. 405.]

Ridge v. Norfolk Southern Railroad Co. (N. C.), 83 S. E. 762, 767, was under the Federal Employers' Liability Act. Plaintiff was a new man and had no special run and was used anywhere on the road when there was a vacancy that he could fill. Plaintiff was on the top of a box car, the top of which was blown off by the wind and he was injured. There were fifteen box cars in the train and there was no evidence that the roof of any of the fifteen cars was blown off except the one in question and on which plaintiff was standing at the time. Plaintiff testified that the velocity of the wind at the time the roof was blown off was such that he could stand on the top of the car without difficulty. The *res ipsa* doctrine was invoked. Plaintiff recovered below and this judgment was affirmed by the Supreme Court of North Carolina. In the Ridge case, the court said: "Some text-writers state that the Supreme Court of the United States does not recognize this doctrine in actions between master and servant, and the case of Patton v. T. & P. Railroad Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, is cited as authority for this contention. The reference in the opinion to this doctrine is *obiter*, as will be seen by a careful consideration of the facts in that case. But even if the court did so hold in that case, the reason for depriving a plaintiff of the benefit of the doctrine, when the plaintiff happens to be a servant of the defendant, no longer exists. Those cases which deny the applicability of the doctrine in an action by a servant against his master proceed upon the theory that the injury may be referred to the negligence of a fellow servant, or to contributory negligence of the plaintiff, with just as much reason as to the negligence of the master. Under the Employers' Liability Act the defense of the fellow servant doctrine is excluded, as is that

of contributory negligence to some extent. Hence the reason for the law, as thus stated, having ceased, the rule ceases."

Sweeney v. Erving, 228 U. S. 233, 57 L. Ed. 815, 33 Sup. Ct. 416, was an action to recover for personal injuries sustained in the making of X-ray tests upon plaintiff's body. In that case, the court, speaking of the *res ipsa* doctrine, said: "In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur*, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff."

The doctrine of *res ipsa loquitur* has at times been denied as between master and servant. [39 C. J. 975.] Under this doctrine, negligence is one of the reasonable inferences of fact which may be drawn from the accident and the conditions and circumstances surrounding it. This inference or presumption is not one of law, but one of fact. [Gordon v. Muehling Packing Co., 328 Mo. 123, 40 S. W. (2d) 693.] In the Gordon case, STURGIS, C., in an able opinion considered at length the subject of the application of the *res ipsa* rule as between master and servant, and therein, it is stated that the distinctive features of the doctrine of the *res ipsa* rule are that it relieves the plaintiff of pleading and proving specific negligence, but not of pleading and proving general negligence, that is, the accident and such attendant circumstances as will support an inference of negligence which the jury must find; and when this is done, the burden of rebutting the inference is upon the defendant. In the Gordon case, 18 Ruling Case Law, page 628, section 124, is quoted with approval, which text is as follows: "The conflict has largely if not entirely subsided in favor of an unlimited recognition of the doctrine *res ipsa loquitur* as applicable to cases of injuries to employees, provided the facts and circumstances are such as to bring the particular case within the scope of the doctrine as it is generally understood. Mere proof of the fact that an employee has been injured while engaged in his duties certainly is not sufficient to make a prima facie case for recovery. If it appears that he has not produced material evidence easily within his reach, the mere proof of the injury does not raise an issue which requires rebuttal by the employer. But where the offending instrumentality appears to have been under the control and within the superior knowledge of the employer, justice requires that he be called upon to explain the

occurrence—the doctrine *res ipsa loquitur* applies. The broad rule is that the mere happening of an accident causing injury is evidence of negligence whenever the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care. . . . The doctrine *res ipsa loquitur* has been held to apply to injuries caused by a scaffold falling, the unexplained starting of machinery,'' etc.

The Gordon case discusses at length the subject of the application of the *res ipsa* rule between master and servant and it is not necessary to enter upon an extended discussion of such subject here.

The Federal Employers' Liability Act, 45 U. S. C. A., section 51, provides that every common carrier by railroad, while engaged in commerce between any of the several states or territories shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ''resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed,'' etc. Recovery cannot be had under the act except by proof of negligence, whether negligence be alleged generally or specifically. The *res ipsa* rule does not mean that one may recover without proof of negligence. In cases where the *res ipsa* rule may be invoked, the accident in question and the attending circumstances and conditions constitute in themselves, when such as to make the *res ipsa* rule applicable, circumstantial evidence of negligence.

It is our conclusion that the *res ipsa* rule in a proper case may be invoked under the Federal Employers' Liability Act, and the question now is: May the *res ipsa* rule be invoked under the facts at bar? Under the Federal rule by which we are governed in the instant case, a mere scintilla of evidence is not sufficient to take an issue of fact to the jury. The Federal rule is ''that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'' [Gunning v. Cooley, 281 U. S. 90, 74 L. Ed. 720, 50 Sup. Ct. 231.]

In the Temple case, supra, the Supreme Court of South Carolina summarized the facts which were held sufficient to take the case to the jury, and this summary was: (1) The fact of section hands working in neighborhood of wreck; (2) the wreck itself; (3) bolts unsecured; (4) spike pulled clear and drawn; (5) bolts and nuts neatly piled up at the ends of the ties; (6) angle plates were properly removed; (7) passage of four or five trains over the point before the wreck occurred; (8) the dent in the end of the rail; and (9) the rigid part of the engine had passed over the point

before the rails spread. For the defendant in the Temple case, as appears from the opinion by the Supreme Court of the United States, one witness, a planter, testified that on examination on the same morning of the wreck, he found that several spikes had been drawn; that the rail had been set in and spiked down on the outside; that the rail was pushed in and then driven down in a new place. A special investigator for the Interstate Commerce Commission, who made an immediate examination, testified that at the point of derailment, one rail was out of place and that the angle bars had been removed from each end of the rail; that the bolts and nuts indicated that they had been removed by some one on purpose; that the condition of the bolts showed that they had not been stripped in any way; that there was no indication that the condition of the track had caused the rail to spread; that an inspection of the locomotive and cars showed no defect that would contribute to the derailment; that the road, apart from the wreck, was in good condition; that the spikes had been pulled directly upward; that had they been crushed out upon the flooring of the rail, it would naturally have made a slanting pull or splintered the tie. The roadmaster testified that he made a close inspection of the track at five-thirty P. M. before the accident. The section foreman testified that the track was in good condition; that the section men had not worked at the place of the wreck for several weeks; that during the week of the accident they had not worked within a mile and a half of the place of the wreck; that they had no tools branded with the name of the Southern Railway Company. The section foreman of the Southern Railway Company testified that on the morning of the accident, he had missed a clawbar and a wrench which he had put in the tool house the evening before and that the tool house had been broken into. There was evidence that these tools were the tools found near the wreck.

The evidentiary facts which plaintiff, in the case at bar, contends support his contention that the facts make a submissible case for the jury under the *res ipsa* rule may be summarized as follows: (1) That a wreck occurred and plaintiff was injured; (2) that the wreck occurred on a curve when the train was four minutes behind schedule and was moving at forty to fifty miles per hour; (3) that under plaintiff's evidence, seventy-five per cent of the ties were in a rotten or deteriorated condition from the switch stand back east for a distance between 200 and 300 feet; (4) that about two feet east of the point where the wheel marks first appeared on the ties, the north rails of the outbound track and on the outside of the curve, were joined with angle bars secured with only two bolts when there were holes for four bolts through said bars; (5) that plaintiff had no knowledge or information concerning the condition of the equipment, the track, roadbed, etc.; (6) that plaintiff's duties were confined solely to looking after the fares.

If plaintiff's evidence in the case at bar, offered under a petition charging general negligence only, had shown clearly the precise or specific negligence which caused the wreck, he could not invoke the *res ipsa* rule. [Glasco Elec. Co. v. Union Elec. Light & Power Co., 332 Mo. 1079, 61 S. W. (2d) 955; Price v. Metropolitan St. Ry. Co., 220 Mo. 435, 119 S. W. 932, 132 Am. St. Rep. 588.] But plaintiff did not waive or lose the benefit of the rule by introducing evidence which did not clearly disclose the cause of the wreck, but left this in doubt. [45 C. J. 1207; Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 31 S. W. (2d) 21; Glasco Electric Co. v. Union Electric Light & Power Co., supra.] We do not think that plaintiff's evidence was such as to clearly show the cause of the wreck. The most that can be said of it is that it tended to show specific acts and omissions on the part of the defendant, which fell short of clearly showing the cause of the wreck and left that in doubt.

For the defendant, the court instructed that the burden of proof was on plaintiff to establish by the preponderance or greater weight of the evidence "the facts necessary to a verdict in his favor under these instructions." Also, the court at the request of the defendant, gave this instruction: "The Court instructs the jury that if you find and believe from the evidence that on the occasion in question the wheels of the engine trucks on defendant's locomotive were derailed by a rock or rocks placed upon the north rail of the defendant's track by a person or persons not in the employment of defendant, and without the knowledge or consent of the defendant, and that after said wheels of said locomotive had so derailed, if you so find, the remaining wheels on said locomotive and train of cars attached thereto, remained upon the rails of said main track until said engine reached a switch where a side track led out of said main track on the north side thereof; and if you further find that said wheels and said locomotive turned out along said side track to the north of the main track, thereby causing said locomotive and a number of cars attached thereto, to become derailed and wrecked, and that said derailment and wreck was caused in the manner aforesaid, and was not due to influence on the part of the defendant, then you are instructed that plaintiff is not entitled to recover, and your verdict should be for the defendant."

Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 960, was an action against the receivers of the Chicago & Alton Ry. Co., and was under the Federal Employers' Liability Act for the death of plaintiff's husband, a fireman. The deceased fireman was killed when the defendant's passenger train was derailed near Independence, Missouri. The negligence charged and submitted to the jury was that the track was permitted to be and remain in a defective and dangerous condition; that the ties were weak, rotten and decayed; that the rails were not sufficiently spiked; that the train was negligently and care-

lessly operated at an excessive rate of speed under the circumstances. It was defendant's theory in the Young case that the train was intentionally derailed by a boy who was put off a freight train the afternoon of the wreck. The deposition of this boy was read in evidence and he testified that when he was put off, he walked to the curve and put an engine boiler bolt nut on the rail near the curve where the derailment occurred and that he put a little chunk of brick and a couple of rocks around it. In that case, the defendant's engineer on cross-examination, gave it as his opinion that such a nut could not have caused the derailment, because it would not stay on the track, even with brick or rock around it. He based this opinion upon his belief that the jarring of the rails from an approaching train would cause it to fall off, and from his experience in placing such a nut on the track near his engine wheel and trying to run the engine wheel over it. In the Young case, some of the railroad officials investigating the cause of the derailment on the same night thereof, found a nut pressed into an oblong shape showing marks which they said, indicated it had been run over by an engine wheel, and this nut was found by the side of the track near the point where the first wheel marks appeared on the ties. They also found brick dust and pieces of tile on and near the rail. Defendant's evidence was that the track was in good condition and that there was a mark indicating that the front engine wheel went on top of the outside rail of the curve, and that this mark extended twenty-three feet, running diagonally across the rail, and that the wheel marks first appeared on the ties at the point where the mark on the ball of the rail disappeared. In the Young case, it was contended that there was no substantial evidence to take the case to the jury. The cause was submitted to the jury on the negligence as above stated and a verdict returned for plaintiff, and the judgment thereon was affirmed. The Young case is not especially important here since the *res ipsa* rule was not involved, but we refer to it to show what facts may make a submissible case. Certiorari was denied in the Young case. [See Wheelock et al., Receivers, v. Young, Admrx., 291 U. S. 676, 71 L. Ed. 1064, 54 Sup. Ct. 527.]

■ We have perhaps extended this opinion beyond reasonable limit. It is our conclusion that under the facts in the case at bar, plaintiff was entitled to go to the jury under the *res ipsa* rule. The order granting a new trial should be reversed and the cause remanded with directions to set aside the order granting defendant a new trial and to reinstate the verdict and judgment for plaintiff, and it is so ordered.