ALICE BENNER, Administratrix of the Estate of WILLIAM H. BENNER, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—156 S. W. (2d) 657.

Division One, October 30, 1941.

Rehearing Denied, December 12, 1941.

*Carleton S. Hadley, Walter N. Davis* and *Arnot L. Sheppard* for appellant.

930

*Mark· D. Eagleton* and *Roberts P. Elam* for respondent.

HAYS, J.—Alice Benner, widow of William H. Benner and administratrix of his estate, brought this action against her deceased husband's employer, the Terminal Railroad Association of St. Louis, to recover damages for the death of her husband. The action is under the Federal Employers' Liability Act, 45 U. S. C. A., Sec. 51 et seq. The trial in the circuit court resulted in a verdict for the plaintiff in the sum of $25,000 and defendant appeals. We shall continue to speak of the parties as the plaintiff and defendant. It is admitted that the defendant is and was a common carrier by railroad and that the decedent at the time of his death was employed by the defendant. It is also conceded that at the time of the alleged accident, hereinafter mentioned, both decedent and defendant were engaged in interstate commerce.

About 6 P. M. on April 30, 1940, the decedent, who was a switching

conductor, was operating his train at a point in Illinois across the river from St. Louis. The train was stopped near a point at which the defendant maintained a telephone in a wooden box fastened to a telephone pole. By means of this phone it was possible for defendant's train crew to communicate with the office of the yardmaster and thus receive orders from him. The telephone line, instrument and other appliances used in connection therewith were owned by and under the exclusive management and control of the defendant. It is not shown that decedent had anything to do with the erection, repair, inspection or maintenance of the telephone system, but simply used it to converse with the yard office just as an ordinary public telephone would be used. At the time last mentioned it was raining and lightning was flashing in the clouds. Decedent descended from the train on the right hand side and walked a distance of some forty feet from the cab of the engine to the phone box. The engineer, who in accordance with custom was seated on the ■■■■ right hand side of the cab, saw decedent go to the phone box but then looked away. When he glanced back he saw the telephone receiver falling from the hand of decedent and from a position next decedent's ear to the end of the cord. He also saw decedent drop his hand to his side and tremble violently. His lips were moving as if he were trying to speak, but the engineer could not overhear any words because of the noise of the engine and the beating of the rain. Shortly thereafter decedent picked up the telephone receiver and completed his call to the yardmaster. The yardmaster, who testified for defendant, said that he had the conversation with decedent; that he heard a click in the telephone but did not receive a shock. When decedent returned to the engine cab he asked the engineer if he had seen the lightning strike the telephone pole and, upon receiving a negative answer, he said "I got a shock." He told other members of the train crew that the phone had shocked him. Some three hours and a half later decedent began to lose control of his body muscles and to have difficulty in speaking. He was taken to the office of a Dr. Canaday and by that time was suffering from marked aphasia and hemiplegia. He, however, was able to tell Dr. Canaday that he had been talking on a telephone and the wires were struck by lightning and he got a shock. He was then taken to a hospital where he died a few days later. During the entire time he was in the hospital his right side was completely paralyzed and he suffered from complete aphasia.

■■■ The case was submitted to the jury upon the theory of *res ipsa loquitur*. To the giving of an instruction embodying the law of *res ipsa* and the refusal of its proffered instruction withdrawing such issue from the jury, defendant excepted and now assigns error.

It is the contention of defendant in the first place that plaintiff's petition charges specific rather than general negligence and that it was therefore improper to submit the cause under the *res ipsa* doctrine.

The general rule in this State, as set forth in the cases hereinafter cited, is plainly to the effect that where a plaintiff charges specific rather than general negligence he will be held to prove the allegations made. The sole question therefore for our consideration in this connection is whether or not the allegations of this pleading are general or specific. We set out the pertinent averments, numbering them 1 and 2 for the purpose of reference:

1. ". . . defendant, its agents, servants, employees (other than said William H. Benner) negligently and carelessly caused, suffered and permitted a high and dangerous current of electricity to flow through said telephone set into the body of said William H. Benner, directly thereby causing him to sustain injuries whereof he died on the 5th day of May, 1940." (A. R. 3-4.)

2. "Plaintiff further states that she does not know the cause of said high and dangerous current of electricity flowing through defendant's said telephone set into the body of said William H. Benner; that said telephone system, telephone set, receiver, transmitter and other parts and appurtenances thereof, were within the exclusive possession and control of defendant, its agents, servants and employees (other than said William H. Benner)." (A. R. 4.)

The criteria to be applied in determining whether an allegation of negligence is special or general were stated with great clarity in the opinion of Judge GRAVES in Price v. Metropolitan Street Ry. Co., 220 Mo. 435, 119 S. W. 932, 132 Am. St. Rep. 588, as follows: (119 S. W. l. c. 937.)

"'(a) Does this petition charge specific acts of negligence? We think not. The only charge is: "The defendant carelessly and negligently caused and permitted the trains on which plaintiff was riding as a passenger to come in violent collision with another train of defendant's, said other train being on said Twelfth street and on said incline as aforesaid; that said collision was occasioned without any fault on the part of the plaintiff, but by reason of the negligence as aforesaid of the defendant." This to our own mind is a charge of general negligence. Had the petition averred a negligent collision of the two trains, and then proceeded to state that such collision was occasioned by the negligence of the gripman in the operation of the car, or the negligence of the conductor in the operation of the train, and pointed out wherein they or either of them had been negligent, or had it charged a negligent failure to use proper appliances and pointed out the insufficient appliances, or had it charged that the collision was due to some negligent condition of the track, naming and pointing out such, or other such similar specific acts, then there would have been specific negligence. . . . No specific acts of negligence are charged in the petition before us now. It is as general as it could be to state a case or charge negligence at all. . . .'"

This opinion of Judge GRAVES was delivered in division but was later adopted by the court en banc. Tested by the yardstick there

laid down, it seems clear that the allegation of the present petition, which we have numbered 1, charges general rather than specific negligence. It does not point out the particular act or omission of the defendant which is said to be negligent. It does not name or otherwise designate the servant or group of servants of the defendant who were guilty of this negligence. It makes no attempt to specify the defect in the machinery, instrumentalities and apparatus which caused the accident. In fact it is hard to conceive how an allegation could be drawn which would be more general than the one here employed.

Another test may be applied. Assume that there were no question of *res ipsa* in the case and that the duty devolved upon plaintiff to plead negligence specifically. Can it be argued that the present allegation would have been sustained as against a motion to make it more definite and certain? If the allegation be not sufficiently certain and particular to withstand such motion where specific negligence had to be charged, then it must be held to be an allegation of general negligence.

Defendant, however, cites and relies upon several decisions of this court which, it is contended, characterize the foregoing allegation numbered 1 as specific. [Kuhlman v. Water, Light and Transit Co., 307 Mo. 607, 271 S. W. 788; Morrow v. Missouri Gas & Electric Co., 315 Mo. 367, 286 S. W. 106; State ex rel. City of Macon v. Trimble et al., 321 Mo. 671, 12 S. W. (2d) 727; Sanders v. City of Carthage, 330 Mo. 844, 51 S. W. (2d) 529.]

The petition in the Kuhlman case alleged that defendant's predecessor had entered into a contract with plaintiff to wire her home for electricity, to inspect and maintain said wiring, and to furnish her with electrical energy from its distribution system; that because of defects (for instance not specified) the wiring of the home became charged with a high-voltage current of electricity; that defendant's attention was called to this and, through its agents and servants, it inspected and attempted to repair said defects; that plaintiff was told that the repairs had been made but that said high-tension current was still allowed to enter the wiring of the home and that plaintiff was shocked and injured thereby. This was held to be a specific allegation of negligence. That it is much more detailed than the allegation in the case at bar is obvious.

In the Sanders case the charge was that defendant negligently permitted a certain high-tension wire to break and to hang down uninsulated within a few feet of the ground where plaintiff's son came in contact with it and was electrocuted. This allegation also is much more specific than the one in the present case.

The petitions in the Morrow and City of Macon cases, however, while differing somewhat from the one in the case at bar, are very similar to the allegation we have numbered 1, and those cases, on the authority of the Kuhlman case, held that the allegations there in-

volved charged specific negligence. It is to be noted, however, that all of the cases cited by defendant were divisional opinions. As such they cannot stand if they are in conflict with the principles laid down in the Price case, which was a decision of the court en banc.

However, all of the cited cases may be distinguished from the case at bar in that none of them contained an allegation similar to the one we have numbered 2. This petition must be read in its entirety and its various parts construed together. When so construed the meaning of allegation number 1 is clarified by allegation number 2, and it becomes obvious that the pleader intended to say and did in effect say that a high-voltage current was permitted to enter the telephone instrument by some means and in some manner unknown to the plaintiff and of which the plaintiff could not gain knowledge. Thus construed, the allegation is obviously one of general negligence only; and if the evidence shows a case to which the *res ipsa* theory can apply, its submission under that theory to the jury was not error and was warranted by the pleading.

But defendant says that the doctrine of *res ipsa loquitur* may never be applied to a case arising under the Federal Employers' Liability Act, supra. This, it is asserted, follows from the fact that such a case is governed by the law as declared ▮ in the decisions of the federal courts and, defendant contends, that the federal courts, including the Supreme Court of the United States, have specifically held that the doctrine of *res ipsa* can never be applied in an action between master and servant. The principal reliance of the defendant in this connection is on the cases of Patton v. Texas and Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, and New Orleans & Northeastern Railroad Co. v. Harris, 247 U. S. 367, 38 Sup. Ct. 535, 62 L. Ed. 1167. But this court had occasion to pass on this identical question in the case of Williams v. St. Louis-San Francisco Railroad Co., 337 Mo. 667, 85 S. W. (2d) 624. We there, in a long and carefully prepared opinion, reviewed all of the applicable federal cases, including all of those now cited by the defendant. We also reviewed numerous authorities from the courts of last resort of other states and we reached the conclusion that there is nothing in the federal decisions to sustain the contention that the rule of *res ipsa* cannot apply as between master and servant. It would needlessly lengthen the present opinion to repeat the analysis of the authorities made in the Williams case. We have not been cited to any decision of the Federal Supreme Court nor have we found any subsequent to the Williams case in which the conclusion therein reached was questioned.

In this connection it is interesting to note that in the case of Central Railroad Co. of New Jersey v. Peluso, 286 Fed. 661, the Circuit Court of Appeals upheld a judgment for plaintiff under the Employers' Liability Act which was based solely upon the *res ipsa* theory and that the Federal Supreme Court refused to review this decision on

certiorari, 261 U. S. 613, 43 Sup. Ct. 359, 67 L. Ed. 827. Had the Supreme Court of the United States felt that the important question of federal law thus involved was decided by the Circuit Court of Appeals in a way probably inconsistent with its own prior controlling decision in the Patton case, certiorari would probably have been granted and the denial of the writ is, to a certain extent, persuasive that that court felt that the Patton case was not to be construed as holding that the *res ipsa* principle can never be applied as between master and servant.

As we read the opinion of Mr. Justice BREWER in the Patton case, supra, it holds only that a distinction is to be made between master and servant cases on the one hand and actions brought by a passenger against a carrier on the other. In the latter type of case the mere existence of the relation of carrier and passenger is sufficient to require the application of the *res ipsa* doctrine, while in master and servant cases other facts than the relationship itself must be shown to bring the doctrine into play. This conclusion seems to us to become obvious when we consider the underlying principles upon which the doctrine rests. The rule is said to have originated in the decision of the Court Exchequer Chamber in Scott v. The London and St. Katherine Docks Co., 3 Hurl. & C. 596. In that case a custom inspector was injured by certain bags of sugar which fell from a warehouse of the defendant. The declaration pleaded general negligence and no specific evidence was introduced to show the exact negligent act or omission of the defendant which produced the fall and injury. A verdict for the plaintiff was upheld and the rule stated in the following language by ERLE, C. J.:

"There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

Of course if the particular machine or device causing the accident were one with which the plaintiff was charged with the duty of maintenance, inspection and repair, the foundation for a *res ipsa* case would not be present; but if the plaintiff servant of the defendant is injured in an accident by some device or machine, the management, control, inspection and repair of which is entrusted to other servants exclusively, there would seem to be no reason for a refusal to apply the *res ipsa* doctrine in the same manner and to the same extent that it would apply in favor of a stranger.

We therefore adhere to the conclusion which we reached in the Williams case.

The defendant next contends that even though the doctrine of *res ipsa* be applied to this case, the evidence is insufficient to warrant

the submission of the case to the jury. In this connection defendant says that we are bound to apply the rule of the federal courts in connection with the direction of a verdict which, in certain particulars, differs from that ordinarily followed by this court. The rule, as announced in the federal courts, is that even though some evidence be adduced by the party having the burden of proof on an issue in support of his contention, a verdict may be directed against him if the evidence of his opponent be so conclusive and overwhelming that no reasonable jury could disregard it. It is also held that a verdict may be directed in favor of the party having the burden of proof where his evidence is convincing, clear, unimpeached, uncontradicted and not inconsistent with natural law. [Small v. Lamborn & Co., 267 U. S. 248, 45 Sup. Ct. 300, 69 L. Ed. 597; Gunning v. Cooley, 281 U. S. 90, 50 Sup. Ct. 231, 74 L. Ed. 720.] In the Williams case, supra, and in the case of Cox v. Missouri-Kansas-Texas Railroad Co., 335 Mo. 1226, 76 S. W. (2d) 411, we assumed that the federal rule in regard to direction of verdicts should be applied in cases under the Employers' Liability Act tried in the courts of this State. Without expressly so deciding we may, for the purpose of the present discussion, assume that this is true. But applying such rule, we think that the trial court properly refused to direct a verdict in defendant's favor.

In the recent case of Terminal Railroad Association v. Staengel, 122 Fed. (2d) 271 (printed in appendix of respondent's brief on page 85), the United States Circuit Court of Appeals for the Eighth Circuit considered the question of the direction of a verdict in a res ipsa case. It there announced the principle that under ordinary circumstances when once the plaintiff has proven an injury as a result of accident and that the accident was caused by some device under the exclusive control and management of the defendant and was of such a nature that it would not ordinarily occur save for the defendant's negligence, a verdict for the defendant should not be directed. It is true that that court recognized that there are exceptional cases in which the defendant's evidence plainly and conclusively demonstrates that the accident was caused by the act of God, the wrongful conduct of a stranger, or by some defect of which the defendant could not possibly have knowledge and which occurred so suddenly that the defendant could not have learned of its existence, in which a verdict may properly be directed. [Dierks Lumber & Coal Co. v. Brown, 19 Fed. (2d) 732.] But these cases remain exceptions to the general rule and do not destroy the rule itself.

██ In analyzing the evidence in the present case the defendant first contends that if the decedent received a shock at all it was because he was struck directly by lightning. Great stress is placed upon the fact that decedent asked the engineer if he saw the lightning strike the telephone pole. But it is shown that persons who receive an electric shock often suffer from hallucinations in which they think

they see a bright flash of light. It was also shown in evidence that the engineer and other members of the train crew did not see the lightning strike the telephone pole or the decedent in spite of the fact that they were but forty feet distant. It is almost inconceivable that decedent could have been directly struck without these persons seeing the flash of lightning or hearing the accompanying thunderclap.

Furthermore the medical evidence offered by plaintiff shows that where a person is struck directly by lightning certain pathological conditions are found to exist which were not present in this case. In view of these facts we do not think that the evidence shows that decedent was directly struck by lightning.

Defendant next says that the evidence clearly demonstrates that the decedent did not die as a result of electrocution at all. Plaintiff called as a witness Dr. Connor, the coroner's physician, who performed an autopsy on decedent on the day of his death. Dr. Connor's examination was a gross one, made without the benefit of microscopic examination of the tissues. While he did not state that decedent died as a result of electric shock, he did say that the conditions he found were entirely consistent with such a cause of death.

Plaintiff also called a Dr. Siebert who was a practicing physician in St. Louis, a graduate of Washington University and who had studied extensively in other institutions in this country and abroad. For a time Dr. Siebert was connected with the faculty of Washington University, teaching pathology. The autopsy performed by him was done under circumstances which were not wholly favorable but which were certainly not shown to have precluded accurate results. In other words, decedent's brain, which had been removed by Dr. Connor, was not replaced in the cranium but was crowded into the abdominal cavity with the viscera properly belonging there, and the body, including the brain, was subsequently embalmed. However, Dr. Siebert thereafter made a thorough post-mortem examination, including the microscopic study of certain sections of the brain. From this study Dr. Siebert found present in the brain a combination of pathological changes which, taken together, were said by him to definitely show death from electrocution. Defendant complains that each one of these changes, taken by itself, might have been produced by other causes. But granted that this is so, the combination of them might definitely indicate electrical death. Such was the testimony of the witness and the mere fact that this testimony was contradicted by the experts called by the defendant does not warrant us in totally disregarding it. The most that can be said is that there was a conflict in the evidence on the point upon which it was the duty of the jury to pass. The jury who saw the witnesses on the stand and observed their demeanor and who watched the countless incidents of the trial, which cannot be reflected in the printed record, chose to

believe the plaintiff's evidence rather than that for the defendant. The trial court, who also had a better opportunity to judge of the credibility of the witnesses than we can have, refused to set aside the verdict. This court would not be warranted in substituting its opinion for theirs.

Defendant attacks the evidence of Dr. Siebert by saying that it is inconsistent, partisan, prejudiced and evasive; but, after reading it carefully, we cannot agree with its characterization.

Defendant says that the evidence clearly showed that there was no defect in its telephone system and instrument which could cause the shock allegedly received by decedent. It offered the testimony of experts who had examined the telephone installation and found that the fuses and lightning arresters were of the standard type ordinarily used on such instruments and were entirely adequate. But here again this testimony is in direct conflict with that of an equally credible expert produced by the plaintiff.

Defendant's experts testified that even though lightning had struck the telephone wire and been carried along the same to the instrument, decedent could not have received a shock through the insulated handle of the receiver unless the current had been strong enough to have completely destroyed the instrument, which it is admitted was not done. On the other hand, plaintiff's evidence showed that decedent did get a shock through the telephone and furthermore plaintiff showed that another witness named Kroeck on the same night' received a shock on the same instrument. Here again it was for the jury to say which evidence they believed.

Defendant complains that the witness Peebles was permitted to testify that the danger of shock could be reduced by providing a dry board for users of the telephone to stand on. This evidence, however, was in rebuttal of that offered by the defendant to the effect that everything had been done which could be done to minimize the danger of shock from the instrument, and upon such issue it was competent.

Defendant also complains of the admission of evidence that the witness Kroeck received a shock on this telephone on the same evening as the accident to decedent and again a few months later. It is true that ordinarily such evidence of other accidents is not admissible because it tends to introduce issues confusing to the jury. But such evidence is admissible in the discretion of the trial judge where it shows or tends to show the condition of a mechanism or instrumentality to be such that accidental injury can be caused by its use. [Wigmore on Evidence (3 Ed.), sec. 458; Charlton v. St. Louis & San Francisco Railroad Co., 200 Mo. 413, 98 S. W. 529.] It is, of course, necessary to show that the condition of the instrument involved was the same at the time of the different occurrences proven, but such proof was here made. We think that the trial judge did not abuse his discretion in admitting this evidence.

942

Certain other assignments with reference to the admission of evidence are made but none of them are supported by the citation of authority, and, in the absence of such support, it would unduly prolong our discussion to notice them individually. It will suffice to say that we have carefully examined them all and find no error in relation to the admission of evidence.

The final contention of the defendant is that the verdict is grossly excessive. At the time of his death decedent lacked but a few days of being 47 years of age. The plaintiff, his wife, was 42 years of age. Under the American Experience Table of Mortality, decedent's life expectancy was 23.08 years. The widow's expectancy of life was somewhat longer than that of her husband. It was shown in evidence that decedent earned on an average of $219.38 per month, of which he contributed $180 to his wife. Discounting an annuity of $180 per month at 3 1/2% per annum, the rate ordinarily used by insurance companies, it would require $33,821.14 to produce such annuity payments. Even discounting the sum at 6% per annum, as permitted in the statutes for valuing life estates, it would require $24,082.64 to produce such an annuity. In the light of these figures we cannot say that a verdict of $25,000 is excessive.

We have found no error in this record prejudicial to the defendant and the judgment of the trial court should accordingly be affirmed. It is so ordered. All concur.