JAMES W. WHITAKER v. NORMAN B. PITCAIRN and FRANK C. NICODEMUS, JR., Receivers for the WABASH RAILWAY COMPANY, a Corporation, Appellants.—No. 37983.—174 S. W. (2d) 163.

Division Two, July 20, 1943.

Rehearing Denied, September 7, 1943.

Motion to Transfer to Banc Overruled, October 4, 1943.

*Joseph H. Miller, R. B. Elster, J. S. Fathman* and *Wilton D. Chapman* for appellants.

*Mark D. Eagleton, James A. Waechter* and *Roberts P. Elam* for respondent.

ELLISON, J.—The plaintiff-respondent recovered judgment against the appellants-defendants receivers of the Wabash Railway Company for $23,333.33 damages for personal injuries sustained while he, as head brakeman, was riding on the locomotive of freight train No. 98 which turned over 2-½ miles east of Moberly, Missouri on June 27, 1939. It is uncontroverted now that one of the probable causes of the derailment was a very heavy rainfall earlier that night, which had washed out the ballast under the ties and a rail of the track. Respondent's petition alleged he did not know the cause of the wreck and pleaded under the res ipsa loquitur doctrine. Appellants' answer pleaded contributory negligence, assumption of risk, Act of God, and that respondent as one of the train crew was in control of the train. Respondent's reply was a general denial. At the trial respondent offered testimony showing the amount and hour of the rainfall; and that it was the duty of the appellants' railroad trackmen to inspect

the track after hard rains; but that no such inspection was made after the rain referred to.

Appellants' assignments of error are: (1) that the res ipsa loquitur doctrine is not applicable to the case because it was brought under the Federal Employers' Liability Act; (2) that even if applicable, the doctrine merely made a *presumptive* prima facie case of negligence for respondent, which presumption disappeared upon the introduction of evidence showing the casualty resulted from an Act of God (the sudden torrential rain and flood), thereby casting on respondent the burden of going forward and producing further evidence, which he did not do; (3) that for these reasons the trial court should have sustained appellants' demurrer to all the evidence, and erred in giving respondent's main instruction No. 1. One of the points made in respondent's brief is that appellants' failure to inspect the track after the heavy rain and before the derailment was, itself, gross negligence. Appellants in a reply brief now urge as another reason why respondent's case should not have been submitted on the res ipsa loquitur theory, that he abandoned it by relying on this specific negligence. In addition to these assignments striking at respondent's whole case, appellants further contend the verdict was excessive.

There is not much dispute about most of the proven facts. Freight train No. 98 left Moberly about 3:12 A. M., eastbound for Hannibal. By that time the rains were over and the night clear. Respondent's duties as head brakeman required him to ride in the locomotive cab on the front of the fireman's seat and to look backward at the train, as well as ahead. There was no water over the track from Moberly to and at the point of derailment. The engineer had passed the same place on a westbound train about 7:30 that evening, and there was no flood water then. He had encountered water over the rails 12 or 13 miles further east, which he reported to the chief dispatcher, recommending a track inspection. Train No. 98 had orders to meet a westbound train at Evansville about six miles east of the scene of the casualty and was running only 25 miles per hour. An examination soon thereafter disclosed that a creek on the south side of the right of way had overflowed, washing out the gravel ballast under the north rail and disarranging some ties. The examination was made and testified to by appellants' witness Messmore. Four railroad employees who had worked on the Hannibal line from 18 to 36 years, testified they had never known of a washout at the place before. An inspection of the track made by the section crew between 6 and 8 P. M. that evening disclosed nothing unusual. The creek at that time was about one-third full.

Three members of a special train eastbound for Hannibal, which left Moberly at 10:45 P. M. the same night, testified they saw no water on the track and nothing extraordinary at the place involved, though it was raining hard at that time. Another train westbound for Hannibal reached Evansville switch some 5-1/2 miles eastward around 2:50

A. M., about 30 minutes before the casualty. It was the place where that train and train No. 98 were to pass. The locomotive began to wabble and the engineer stopped and waded through the water for about a mile to warn the train dispatcher's office by telephone. He was unable to make himself understood but learned later that train No. 98 had already departed. The water at Evansville switch was about three feet deep over the track for a distance of 2000 feet.

Now as to the time and amount of rainfall. Respondent's evidence showed it rained at Moberly from about 5 or 5:30 P. M. until 7 or 8 o'clock. The chief train dispatcher, whose deposition respondent had taken, said there was another hard "shower" at Moberly between 9 and 9:30 P. M., but it lasted only a short time and he did not feel justified in ordering the section men out for another inspection. The Superintendent of the Moberly Waterworks testified the first rain was from 5 to 7 or 7:30 P. M. and by measurement in a bucket the precipitation was 2 to 2-½ inches. A second and very unusual rain began about 10:30 P. M. and lasted 30 to 45 minutes. This one measured 3-½ to 4 inches, making 5-½ to 6-½ inches in all. The two rains filled the waterworks dam for the first time in two years. These were respondent's witnesses. A rural mail carrier and six farmers residing from one-half mile to 2-½ miles from the point of derailment, were called by appellants. All testified the rain was unprecedented, moving logs, driftwood, wheat shocks, growing corn, highway bridge approaches and the like. None of these witnesses testified to the time of the second rainfall except to say it fell that night. Two of the farmers measured the precipitation at 6 inches and another at 7-½ inches.

Yet in the face of all this evidence as to the enormous rainfall, appellants' witness Messmore, who was assistant general manager of the railroad and happened to be in Moberly that night asleep in his special car, testified he was notified of the derailment, immediately got up, dressed, and had his car run to the scene thereof because he feared some of the train crew must have been injured. He said: "At the time I got there the water was low in the creek" (which had overflowed, causing the derailment). The train crew of No. 98 also said there was no appearance of flood water there. Since it seems that considerable time would be required to permit that much water to run off, a natural inference is that the rain must have fallen substantially earlier in the evening. This tends to harmonize with the testimony of the Moberly Waterworks superintendent, who fixed the time at 10:30 to 11:15 that night, nearly five hours before the derailment.

We comment on this fact because appellants urge in their brief that two of their farmer witnesses estimated the time of the heavy rainfall at 1:30 A. M., and the remaining witness at 2:30 A. M. Mr. Thompson, one of these three witnesses, who lived at Evansville six miles east, did say [166] that. But then he added that he "got up and looked out" and saw water on two sides of the house and coming up the bottom, thus indicating he had been asleep and that the rain must have

begun to fall sometime before. Another witness, Murphy, said the previous witness, Thompson woke him up between 1:30 and 2 o'clock. He proceeded to move some hogs "because the water kept coming pretty fast." The third witness Brantegem, who lived five miles east of Moberly and two miles from the point of derailment, said he saw a big black cloud coming up in the west (the direction of Moberly), about 10 P. M. and put a can out to catch the rain. His measurement of the precipitation from that second rain alone was 7 inches. He heard it raining during the night, and the next morning at 2:30 it had quit. But on cross-examination he said the big amount of rain was along about 10 o'clock; again, that the cloudburst he had spoken of happened around 10 o'clock; and finally that he judged it rained pretty heavy between 10 and 11 o'clock. What happened after that he didn't know, except that when he got up at 2:30 it had quit raining. We can see nothing in this testimony indicating the heavy rain did not fall until about 1:30 to 2:30 A. M., an hour or two before the casualty. At least there is very substantial evidence that it mainly took place four or five hours theretofore.

██ On the first assignment of error—that the res ipsa loquitur doctrine does not apply to master and servant personal injury actions brought under the Federal Employers' Liability Act. It was held in Gordon v. Muehling Packing Co., 328 Mo. 123, 131, 40 S. W. (2d) 693, 696, that the doctrine applies to personal injury actions brought by a servant against his master, when: (1) the accident is of so uncommon a character as to furnish evidence of negligence; (2) the cause of injury cannot be clearly shown by the plaintiff employee and ought to be known to the defendant employers; (3) it does not appear the plaintiff has failed to produce material evidence easily within his reach; (4) and the offending instrumentality appears to have been under the control and within the superior knowledge of the employer. The fact that the plaintiff employee was operating or working with the instrumentality does not of itself necessarily forbid the application of the doctrine. In this Gordon case the plaintiff was reassembling an electric sausage grinding machine after he had cleaned it, when it suddenly started.

The Gordon case was not an action for damages under the Federal Employers' Liability Act, but was followed in Williams v. St. L.-S. F. Ry. Co., 337 Mo. 667, 684(2), 85 S. W. (2d) 624, 634(2), which was under that Act. There a train auditor was injured by a derailment. He had no control over the management of the train and knew nothing about the condition of the equipment, track, roadbed, etc. The Williams case expressly held the res ipsa doctrine is applicable to actions under the Federal Employers' Liability Act in the circumstances prescribed in the Gordon case. It did this after a thorough review of many Federal cases, including two cited by appellant here;[1] and has

[1]Patton v. T. & R. Rd. Co., 179 U. S. 658, 45 L. Ed. 361, 21 S. Ct. 275; N. O. & N. E. Rd. Co. v. Harris, 247 U. S. 367, 62 L. Ed. 1167, 38 S. Ct. 535.

been followed three times by this court.[2] In one of these, the Sibert case, the death of a brakeman riding on the front footboard of a switch engine resulted from a broken rail in the track.

Appellants have cited another case not referred to in the Williams case—So. Ry. Co. v. Stewart, 115 Fed. (2d) 317, 322(6, 9). It is not in point. It was an action based on the Safety Appliance Act and brought under the Federal Employers' Liability Act, for the death of a switchman killed while coupling cars. The petition was not for negligence, but for a specific violation of Sec. 2 of the Safety Appliance Act in furnishing a car not equipped with automatic couplers. The doctrine of res ipsa loquitur is not mentioned in the opinion, nor in two U. S. Supreme Court cases it cites on a question of the burden of proof in negligence cases.[3]

On the other hand the respondent has [167] cited one Missouri case and four Federal decisions in which the res ipsa loquitur doctrine was applied in personal injury actions under the Federal Employers' Liability Act and certiorari was denied by the United States Supreme Court.[4] In one of these four cases, the Smith case, the rear brakeman was riding in the caboose and was injured by the sudden stopping of the train; in another, the Staengel case, a brakeman was sitting on the rear sill of the last car of a switching train, when that car struck a split switch. In still another case not included in the list just cited, Lowery v. Hocking Valley Ry. Co., 60 Fed. (2d) 78, a conductor riding in the caboose was injured by the derailment of his train, caused, as appeared from the subsequent investigation, by the lodgment of a broken plank in the trucks at a crossing further back.

In our opinion appellants have wholly failed to establish that the res ipsa loquitur doctrine always and in general is inapplicable to actions under the Federal Employers' Liability Act. Neither do we think they have shown this case does not come within the specifications laid down in the Gordon case supra, 328 Mo. 1. c. 131, 40 S. W. (2d) 1. c. 696. As appears from the decisions just reviewed, the accident was of such character as to warrant an inference of negligence; and the train was under the control and within the superior knowledge of appellant. At least it was not under the control of the respondent.

[2]Sibert v. Litchfield & M. Ry. Co. (Mo. Div. 2), 159 S. W. (2d) 612, 617(5); Benner v. Term. Rd. Assn., 348 Mo. 928, 937(2), 156 S. W. (2d) 657, 661(6); Noce v. St. L.-S. F. Ry. Co., 337 Mo. 689, 693(3), 85 S. W. (2d) 637, 641(5).
[3]A rehearing was granted in the Stewart case; a new opinion written, 119 Fed. (2d) 85; certiorari was granted, 314 U. S. 591, 86 L. Ed. 477, 62 S. Ct. 71; and the cause was reversed because neither party was entitled to prevail. 315 U. S. 283, 86 L. Ed. 849, 62 S. Ct. 616.
[4]Benner v. Term. Rd. Assn., supra, 348 Mo. 928, 156 S. W. (2d) 657, 315 U. S. 813, 86 L. Ed. 1211, 62 S. Ct. 798; Cent. Rd. of N. J. v. Peluso, 286 Fed. 661, 666-7, 261 U. S. 613, 67 L. Ed. 827, 43 S. Ct. 359; B. & O. Rd. Co. v. Kast, 299 Fed. 419, 266 U. S. 613, 69 L. Ed. 468, 45 S. Ct. 95; C. & O. Rd. Co. v. Smith, 42 Fed. (2d) 111, 113, 282 U. S. 856, 75 L. Ed. 758, 51 S. Ct. 32; Term. Rd. Assn. v. Staengel, 122 Fed. (2d) 271, 273-4, 136 A. L. R. 789, 314 U. S. 680, 86 L. Ed. 544, 62 S. Ct. 181.

In several of the cases reviewed the plaintiff was a member of the crew operating the train. In the Lowery case, supra, he was the conductor, and we assume in charge of the train but not the engine; yet the res ipsa loquitur rule was applied. It may be that if the facts were like those in Seaboard Airline Rd. Co. v. Horton, 233 U. S. 492, 58 L. Ed. 1062, 34 S. Ct. 635, cited by the appellants (though that was not a res ipsa loquitur case) the doctrine would not have been applied. There the thin glass water tube or gauge of a locomotive boiler exploded while unprotected by a guard glass, injuring the engineer in charge, whose duty it was to inspect. The opinion held the defendant was entitled to an instruction on assumption of risk, and the judgment was reversed and remanded.

We are furthermore unable to agree that in any fair sense it can be said respondent was in possession of all the facts and could have shown clearly the cause of his injury, but failed to do so; or that he was bound to and did submit his case on specific negligence, as asserted in appellants' reply brief. This is true notwithstanding respondent's brief says: "in any event defendants' evidence showed that the derailment was caused by the grossest kind of negligence on the part of the defendants" (failure to inspect the track after the second rain); and again, that the authorities not only show he (respondent) made a prima facie case under the doctrine of res ipsa loquitur by proof of the derailment of the train, but also (italics ours) *"that the defendants' evidence here tended strongly to support plaintiff's prima facie case in that it conclusively established the cause of the derailment was the gross negligence of defendants' servants in failing"*—to inspect the track after the second rain. This is the language appellants stress.

As we have stated, appellants' contention that respondent abandoned the res ipsa loquitur doctrine and committed himself to a specific negligence theory is made for the first time in a reply brief. Ordinarily this cannot be done. Smith v. Thompson, 346 Mo. 502, 514(9), 142 S. W. (2d) 70, 76(12). Neither do we find anything on that point in appellants' motion for new trial. The assignments that come nearest to it are No.'s 15, 16 and 17, which say that appellant sought to go to the jury on a presumption or piled presumptions under the res ipsa loquitur doctrine, which were disproved by positive and uncontradicted evidence; but *if* he attempted to go to the jury on specific negligence, there was no competent evidence proving specific negligence on the part of the defendants. There is no claim or hint anywhere in the motion that [168] respondent *waived* the benefit of the doctrine. Nevertheless we shall consider the assignment.

Undoubtedly the sudden derailment of the train would have made a prima facie case within the res ipsa loquitur rule if nothing further had been shown. There were several possible negligent causes for the casualty, such as defective equipment or track, improper dispatching of the train, etc. Most of the evidence on these points was in appel-

lants' hands. Appellants' answer had pleaded the defense of vis major, the sudden heavy rainfall as an Act of God. The burden was on them to establish it as the *sole* proximate cause of respondent's injury.[5] Respondent had taken the deposition of appellants' night chief train dispatcher before the trial. At the trial, as a part of his case in chief, he endeavored to meet that defense by proving the amount of rainfall, and that all of it had fallen over four hours before train No. 98 left Moberly; also that the train dispatcher had not ordered another track inspection after the second rain, which was twice as heavy as the first. It was the practice to make such inspections after unusually heavy rains. But the testimony that the ballast had been washed from under the ties came from appellants' witness.

Did this amount to proof of independent, specific negligence proximately causing the derailment, or was it essentially evidence rebutting the defense of vis major? It is true that many decisions speak of negligence *concurring* with an Act of God,[6] among them the Ford case from this state, just cited. But as the terms vis major and Act of God imply, the phenomenon must be irresistible, overpowering, and the effect unpreventable. When the result in part is ascribable to the participation of man, either through active intervention or neglect or failure to act, "the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God."[7] Hence, when it is shown that in the exercise of due care, by way of anticipation or prevention, the casualty might have been averted by the defendant notwithstanding the abnormal event, that *defense* fails. This is true whether the negligent omission be called concurring negligence or not.

We take the view, as stated, that in the foregoing circumstances it would be unjust to hold respondent abandoned reliance upon general negligence covering all the other possible negligent causes of the derailment available to him under the res ipsa loquitur doctrine, merely because he offered evidence of the time and amount of the rainfall, and of a negligent failure to inspect the track, which would nullify the defense of Act of God; or because he said in his brief that the appellants' own evidence on the same point showed gross negligence and tended to support his (respondent's) prima facie case under the doctrine. Note, these expressions did not say *respondent's* evidence on the same point showed gross negligence, but only that *appellants'* own evidence did. See Philibert v. Ansehl Co., 342 Mo. 1239, 1250, 119 S. W. (2d) 797, 802(13). And appellants are still disputing here that

[5]21 R. C. L., sec. 125, p. 569; Ford v. Wabash Ry. Co., 318 Mo. 723, 732-3, 300 S. W. 769, 773-4 (1, 2, 3); Hatswell v. C., B. & Q. Rd. Co. (Mo. App.), 198 S. W. 85.

[6]38 Am. Jur., sec. 65, p. 719; 45 C. J., sec. 127, p. 796, sec. 493, p. 934, sec. 939, p. 939; 52 C. J., sec. 1849, p. 270.

[7]1 C. J., sec. 2, p. 1174; 1 C. J. S., p. 1423-4; 38 Am. Jur., secs. 6, 7, pp. 648, 649.

858

there was *any* substantial or prevailing evidence to that effect on either side of the case.

The decision stressed by appellants on this point is Berry v. K. C. Pub. Serv. Co., 343 Mo. 474, 483, 121 S. W. (2d) 825, 830 (1, 2, 3). But in that case, as the opinion states, there was no real dispute about the cause of the accident and the *plaintiff* proved the defendant's *only* negligence was a single specific act. Among other decisions, the Berry case follows and quotes Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 143, 31 S. W. (2d) 21, 25 (5), where many prior decisions were cited. There, again, it was stated that there was no substantial dispute about the causal facts; and the plaintiff's brief contained the unequivocal statement: "Instead of relying upon any presumption, the plaintiff has proved her case by direct evidence." We do not mean to say the proof of waiver or abandonment was that strong in all the intermediate cases between these two. But they all follow the rule generally recognized, which is that a plaintiff does not waive the benefit of the res ipsa loquitur doctrine by introducing evidence tending to show the specific cause of the casualty, [169] if the true cause is still left in doubt or is not clearly shown. The contrary is true if the precise cause be shown.

Bond v. St. L.-S. F. Ry. Co., 315 Mo. 987, 288 S. W. 777, was a case much like this. The plaintiff passenger had sued under the res ipsa loquitur doctrine for injuries sustained when a train was derailed at a trestle. The railroad's defense, as here, was an Act of God—a sudden unprecedented rain which had washed out some of the bridge supports. In rebuttal the plaintiff introduced evidence tending to show, as here, a negligent failure to know of the flood, anticipate its effect and to inspect the bridge. A judgment for plaintiff was affirmed. There is nothing in the foregoing decisions calling for a conclusion different from that stated in the second preceding paragraph.

This brings us to appellants' second assignment of error, contending the res ipsa loquitur doctrine merely makes a *presumptive* prima facie case for the plaintiff, which disappears upon the presentation of substantial evidence exculpating the defendant, and casts the burden on the plaintiff to prove specific negligence. They strongly rely on Hurck v. Mo. Pac. Ry. Co., 252 Mo. 39, 47-8, 158 S. W. 581, 583 (1), which did recognize that rule where the defense was an Act of God. Several Federal cases also are cited.[8] But the Hurck case is not in line with later decisions of this court. Bond v. St. L.-S. F. Ry. Co., supra, 315 Mo. l. c. 1002, 288 S. W. l. c. 782 (3) held the prima facie showing made by a plaintiff under the res ipsa loquitur doctrine raises a substantial factual inference of the defendant's general negligence, which is *evidence* that does not disappear on the introduction of the defendant's exculpatory evidence but is sufficient to support an af-

---

[8]Wallar v. So. Pac. Ry. Co., 37 Fed. Supp. 475, 477, 478; Brunell v. Mountain States Power Co., 81 Fed. (2d) 305; Hagan & Cushing Co. v. Wash. Power Co., 9 Fed. (2d) 614.

firmative finding. This view has been followed, or not disputed in all our subsequent cases.[9] Respondent has also cited two cases decided by the United States Supreme Court and others decided by the District and Circuit Courts to the same effect. The former are San Juan Light & Transit Co. v. Requena, 224 U. S. 89, 98-9, 56 L. Ed. 680, 32 S. Ct. 399 and Sweeney v. Erving, 228 U. S. 233, 240-2, 57 L. Ed. 815, 33 S. Ct. 416.

The only remaining assignment of error is that the verdict was excessive, showing it was the result of prejudice against the appellants and improper conduct by the jurors. This contention is urged, apparently, solely as a ground for reversing the judgment. We are not asked to enter a remittitur, and no cases are cited to aid us in passing on such a question. This fact was pointed out in respondent's brief. In their reply brief appellants say the citation of authority is unnecessary since each case must depend on the particular injuries proven. Neither are we referred to any misconduct by the jurors, except the alleged prejudice and passion evidenced by the size of the verdict. It is, however, suggested in appellants' main brief that the verdict of $23,333.33 shows on its face it was a quotient verdict because after the first figure, 2, it runs in a sequence of 3's. The amount sued for was $60,000.

The respondent was about 38 years old when injured. He weighed 148 pounds and said he had been in good health theretofore. He had been working for the railroad for about 16 years. His left foot was mashed and sprained in the derailment but his chief injury was to the lower part of his spine. He was taken to the Wabash Hospital in Moberly where he remained about two weeks in a bed, chair or on crutches. At one time after his injury his weight went down to 119 pounds and at the time of the trial it was 132 pounds. After discharge from the hospital he went home on crutches. These were presently discarded for a cane, but he continued to make [170] periodic visits to the hospital for about three months, and then reentered for nearly two months because of increasing pain in his back, resulting from exercise recommended by the doctors.

After leaving the hospital the second time respondent made a trial run in a passenger train to St. Louis. This caused such pain that he was confined to his bed there for several days, and he suffered a

[9]Roberts v. Schaper Stores Co., 318 Mo. 1190, 1197, 3 S. W. (2d) 241, 243(7); Conduitt v. Trenton Gas & Elec. Co., supra, 326 Mo. l. c. 143, 31 S. W. (2d) l. c. 25(6); Gordon v. Muehling Packing Co., supra, 328 Mo. l. c. 138, 40 S. W. (2d) l. c. 700; Steffen v. S. W. Bell Tel. Co., 331 Mo. 574, 587, 56 S. W. (2d) 47, 50; Toroian v. Parkview Amusement Co., 331 Mo. 700, 706, 56 S. W. (2d) 134, 136; State ex rel. Kurz v. Bland, 333 Mo. 941, 947, 64 S. W. (2d) 638, 641; Watts v. Moussette, 337 Mo. 533, 542-3, 85 S. W. (2d) 487, 492; Evans v. Mo. Pac. Ry. Co., 342 Mo. 420, 424(2), 116 S. W. (2d) 8, 9; Turner v. M., K. & T. Rd. Co., 346 Mo. 28, 36-7, 142 S. W. (2d) 455, 460(9), 129 A. L. R. 829; Kellogg v. Murphy, 349 Mo. 1165, 1180(7), 164 S. W. (2d) 285, 293(9)

like result after his return trip to Moberly. About five months later in April, 1940 a metal, canvass and leather back brace was prescribed by a St. Louis physician. Respondent made several trips to that city, each of which caused severe pain. Thereafter he received electrical treatments. At the trial about two years after his injury he testified the pains in his spine were severe and had been continuous but of varying intensity. The back brace gave him some relief. Without it the pain would return. Swaying of his body, walking up and down stairs, and stepping over street curbs caused a ''grating'' pain in the back.

The medical testimony showed respondent had sustained a fracture of the left transverse process of the 2nd lombar vertebra, which had healed with a slightly ''humped'' deformity. There was also a congenital malformation of the 5th lombar vertebra, reducing the normal seating space of the spinal column on the sacrum and pelvis. It was the opinion of respondent's medical experts that as a result of the violent derailment respondent suffered injury to the nerves in that region, explaining his pain. One physician who examined respondent three times, first about a year after the injury, gave it as his professional opinion that respondent would continue to suffer pain in the future and would be unable to do physical work of any character.

Respondent's testimony was undisputed that his average monthly earnings during his 16 years of service on the railroad were about $180 per month. When laid off they would be about $125 per month. His loss of earnings during the period between the date of the injury and the date of trial were about $4000. The present cash value of his anticipated future earnings, computed under Sec. 3522, R. S. 1939, Mo. R. S. A., sec. 3522, would amount to $26,436, making a total of nearly $30,500, irrespective of damages for pain and suffering. If we were to attempt to make our own appraisal of respondent's damages it would seem to us, in view of such cases as Brady v. Term. Rd. Assn., 344 Mo. 502, 127 S. W. (2d) 1, that the verdict was rather high. The verdict in the Brady case was $15,000. But the plaintiff there was not incapacitated for doing some kinds of work. Without further citation of authorities to guide us, and in view of the fact that plaintiff's earnings lost because of the casualty would exceed $30,000, we feel unwarranted in reducing the judgment.

This necessarily means that we are unable to say from the face of the verdict that it was the result of passion and prejudice. As to the contention that it was a quotient verdict, the figures might suggest the sum of $70,000 had been divided by three. But the suit was for $60,000. In a case where the facts were much stronger, Thompson v. City of Lamar, 322 Mo. 514, 548(V), 17 S. W. (2d) 960, 977, it was held the vice of quotient verdicts is the jurors' mutual agreement *in advance* of the verdict to abide by the unknown and unascertained result of their calculations, obtained by taking an average of the

award favored by each juror. If the jurors have not bound themselves beforehand to accept the unascertained quotient, but do so after it has been computed, the verdict will not be vitiated. There is no evidence here whatever of such an agreement.

Respondent asks us to assess a 10% penalty against appellants under Sec. 1230, R. S.' 1939, Mo. R. S. A., sec. 1230, for vexatious appeal. In the circumstances of the case we are disinclined to do so.

Finding no error in the record, the judgment is affirmed. All concur.